JOHN B. HYNES, JR., AND MARIE T. HYNES, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JOHN B. HYNES, JR., INDIVIDUALLY AND AS TRUSTEE, WOOD SONG VILLAGE TRUST, AND MARIE T. HYNES, INDIVIDUALLY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6852–76, 13886–78.    Filed September 15, 1980.

*C. Frederick Bent III* and *Philip Raoul Tetu,* for the petitioners.
*Barry J. Laterman,* for the respondent.

Simpson, *Judge:* The Commissioner determined the following deficiencies in the petitioners' Federal income taxes:

| Petitioner | Year | Deficiency |
|---|---|---|
| John B. Hynes, Jr., and Marie T. Hynes | 1973 | $4,992.70 |
| | 1974 | 16,259.26 |
| | 1975 | 12,502.76 |
| | 1976 | 20,966.51 |
| Wood Song Village Trust | 1975 | 30,571.84 |

After concessions by the parties, the issues for decision are: (1) Whether the trust created by the petitioner for the purpose of developing and selling real estate for profit is an association taxable as a corporation; (2) whether the petitioner is entitled to a deduction for a business loss resulting from the foreclosure of a mortgage executed by the trust and guaranteed by him; (3) whether the petitioner may deduct in 1976 the interest and real estate taxes owed by the trust when the bank foreclosed on its mortgage; (4) whether the petitioner is entitled to deduct as business expenses under sections 162 and 274(d) of the Internal Revenue Code of 1954[1] certain expenditures for his wardrobe, laundry and dry cleaning, haircuts and makeup, hotels and meals, and automobile use and depreciation; (5) whether the petitioners may deduct under section 280A expenses claimed to have been incurred for the use of a room in their residence as a home office; and (6) whether the Wood Song trust failed to report income in 1975 from the sale of certain property.

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, John B. Hynes, Jr., and Marie T. Hynes, husband and wife, resided in Chatham, Mass., at the time they filed their petitions in this case. They filed their joint Federal income tax returns for 1973, 1974, 1975, and 1976 with the Internal Revenue Service Center, Andover, Mass. The petitioner, Wood Song Village Trust (Wood Song or the trust), was organized under the laws of Massachusetts and had its principal office in Boston, Mass., at the time it filed a petition in this case. The trust filed Federal income tax returns (Forms 1041) for 1973, 1974, and 1975 with the Internal Revenue Service Center, Andover, Mass. Mr. Hynes will sometimes be referred to as the petitioner.

During the years in issue, the petitioner was employed as a staff announcer and television newswriter by Boston Broadcasters, Inc., WCVB-TV (the station), in Needham Mass. His contract with the station required him to appear 5 days a week, 48 weeks during the year, on the 6 p.m. and 11 p.m. newscasts. During such years, such contract also required that he maintain "a physical appearance suitable for services as a television announcer." The petitioner wore regular business clothing on his television appearances, but his selection of such attire was limited to colors and patterns which would televise well. He often changed his shirt between the 6 p.m. and 11 p.m. broadcasts, and he had his hair cut once every 4 weeks to maintain a neat appearance. The petitioner was not reimbursed by the station for the costs of his wardrobe, dry cleaning and laundry, or haircut and makeup during the years in issue. The petitioner's employment contract with the station for 1978 does provide him with a clothing allowance.

It was approximately 90 miles between the petitioner's home and the station, and therefore, during the years in issue, he lived in hotels near the station during the work week. He drove to his home in Chatham on weekends and often once during the workweek. The rooms in which he stayed were ordinary hotel rooms and did not have kitchen or office facilities. The station provided a large workroom with desks and typewriters for the use of all newsroom employees, and the petitioner worked wherever there was an empty desk. However, since the petition-

er did not have his own office or telephone at the station, he sometimes had business meetings with various people at his hotels. He made telephone calls from the hotel rooms, and he kept a small filing box and his briefcase with personal papers in such rooms.

The petitioner also used a room at his home in Chatham as his office and library. The room had a desk, filing cabinet, typewriter, and a telephone. He kept his personal papers in the room as well as his trade journals and some of the materials that he used as sources for his stories. Mrs. Hynes was a licensed real estate broker and had an office in Chatham, but she also used the room in the residence to deal with clients on the telephone and kept some of her records there.

The station provided transportation when the petitioner left from the station with a news crew to cover a story. However, on some occasions, he used his personal automobile in the course of his employment with the station. At times, he drove his car to the scene of a news story to meet a film crew, or he used his car to meet with some of his news sources. He was not reimbursed by the station for such travel. The petitioner also used his car to drive to work each day and to drive to Chatham during the week and on weekends.

The petitioner is also a licensed real estate broker. On August 11, 1973, he entered into an agreement with the trustees of the Nauset Realty Trust (Nauset Trust) under which he agreed to purchase from the trust 67 lots of real estate located in Brewster, Mass. (Brewster property). The purchase and sale agreement was subsequently modified on September 7, 1973, and the purchase price for the land was set at $335,000 plus various amounts which were to be paid to Frank Ireland of Orleans, Mass., who was designated as the broker for the land. On August 14, 1973, the petitioner applied to the Bass River Savings Band (Bass River Bank) for a mortgage loan of $497,000 to finance the purchase of the Brewster property. The Bass River Bank sent a commitment letter to the petitioner on September 7, 1973, approving his request for a $500,000 mortgage, but as a condition of such mortgage, the bank required that the petitioner personally guarantee the note. The petitioner accepted the bank's terms for such mortgage on September 8, 1973.

On September 7, 1973, the Wood Song Village Trust was

formed by an agreement and declaration of trust executed by and among the petitioner, C. Frederick Bent III, and Richard W. Hynes as trustees. Such declaration was recorded in the Barnstable Registry of Deeds, and in such trust agreement, the petitioner conveyed the rights that he had acquired to the Brewster property under the agreement with the Nauset Trust. All 6,000 shares of beneficial interest in the trust were issued to the petitioner, who held them during the years in issue. He did not plan to sell any shares or portions thereof to anyone at any time. One of the objectives of the Wood Song trust was to sell the Brewster property for profit, and after all the property had been sold, the petitioner intended to apportion the profits among his four children.

As to the continuity of the trust, article 14 of the Wood Song trust agreement states in part:

This Trust shall terminate upon the expiration of twenty (20) years after the death of all of the original Trustees, and may be sooner terminated by vote of, or by an instrument or instruments in writing signed by a majority of the Trustees and by the holders of a majority of each class and series of the voting shares outstanding * * *

Article 2 of such agreement provides that "The death [,] resignation or incapacity of any of the Trustees shall not terminate the Trust or in any way affect its continuity"; such article also provides for the replacement of trustees by the remaining trustees. Article 9, paragraph II, of such agreement provides in part:

II   The death, insolvency, or incompetency of one or more of the beneficiaries, or the transfer of shares shall not terminate the Trust. * * *

With respect to the management of the trust, article 3 of the Wood Song trust agreement provides that a majority vote of the trustees is required for "the validity of any action taken by them." Article 5 of such agreement provides in part:

The Trustees shall have full and absolute power, control and authority over the Trust property held by them at any time hereunder and over the business of the Trust to the same extent as if the Trustees were the sole owners of such property and business in their own right, exercisable without the consent of the Beneficiaries * * *

In connection with the personal liability of the trustees and shareholders, articles 7, 8, and 10 of the Wood Song trust agreement provide in part:

ARTICLE SEVEN: Rights of Third Persons.

I Every act or thing done or omitted, and every power exercised or obligation incurred by the Trustees or any of them in the administration of the Trust or in connection with any business, property or concerns of the Trust and the Trust estate, whether ostensibly in their own names or in their capacity as Trustees hereunder, shall be done, omitted, exercised or incurred by them as Trustees, and not as individuals; and every person contracting or dealing with the Trustees, or any agent or representative of the Trustees acting within the scope of this authority, or any person having any claim against the Trustees, their authorized agent and representatives, whether founded in contract, replevin or tort shall look only to the Trust estate for the payment or satisfaction of the same; and no shareholder or Trustee, and no agent or representative of the Trustees acting within the scope of his authority, shall ever be personally liable for or on account of any contract, debt, tort, claim, damage, judgment or decree arising out of or connected with the administration or preservation of the Trust estate or the conduct of the business of the Trust. A stipulation or notice to this effect shall be inserted in every contract, order or other instrument signed by the Trustees or their duly authorized agent and representatives, but the omission thereof shall not constitute a waiver of the foregoing provisions and shall not render the Trustees, their authorized agent or representatives, or any shareholder, personally liable.

\*    \*    \*    \*    \*    \*    \*

ARTICLE EIGHT: Protection of Trustees and Shareholders.

\*    \*    \*    \*    \*    \*    \*

II No shareholder shall be personally liable for any obligation or liability incurred by this Trust or by the Trustees, and the Trustees shall have no right of indemnity or exoneration against the shareholders in respect thereof.

III Subject to Paragraph V of this Article, no Trustee shall be personally liable for any obligation or liability incurred by this Trust or by the Trustees, and each Trustee shall be entitled to reimbursement and exoneration out of the Trust estate according to law.

IV The Trust estate alone shall be liable for the payment or satisfaction of all obligations and liabilities incurred in carrying on the affairs of this Trust.

V Proceedings against this Trust may be brought against the Trustees as Trustees hereunder but not personally. The Trustees shall be parties thereto only insofar as necessary to enable such obligation or liability to be enforced against the trust estate.

VI No trustee shall be liable to this Trust or the shareholders except for his own acts, neglects and defaults in bad faith.

\*    \*    \*    \*    \*    \*    \*

ARTICLE TEN: Personal Liability of the Beneficiaries.

The Trustees shall have no power to bind the Beneficiaries personally. All persons dealing with the Trustees or with any agent of the Trustees shall look only to the Trust property for the payment of any sum due as a result of such dealing. In every instrument executed by the Trustees and creating an obligation of any kind, the Trustees shall in substance provide that no Beneficiary shall be held to any personal liability under such instrument.

As to the transfer of the shares of beneficial ownership, article 9, paragraph III, of the Wood Song trust agreement provides:

III   A certificate of beneficial interest may not be transferred by the holder thereof except upon the unanimous decision of the Trustees. The acceptance by the transferee of a certificate transferred to him, or of any certificate issued in place thereof shall constitute such transferee a party to this Agreement and shall bind him to the provisions thereof. No such transfer shall be binding upon the Trustees until it has been recorded on the transfer books of the Trust.

In addition to the powers conferred on the Wood Song trustees under the articles of the trust, the trustees unanimously voted on September 30, 1973, that any one trustee could execute documents which would bind the trust on all matters regarding the sale of the Brewster property.

On September 7, 1973, the Wood Song trust entered into an exclusive agreement with Frank Ireland Real Estate Co. of Orleans, Mass., for brokerage services for the sale of the Brewster property. Under such agreement, Mr. Ireland would receive a 10-percent commission on the sale of each lot, but such agreement did not give him the authority to bind the trust. The trust also entered into an agreement with Richard W. Hynes which provided that he would act as its conveyancing attorney. Such agreement provided that he would receive $200 plus expenses for his assistance in the sale of each lot. Wood Song also contracted with Boston Personal Resources, Inc. (Boston Resources), for investment planning, accounting, and other management services. Under its agreement with the trust, Boston Resources would receive 20 percent of the net contract price on a sale of land as defined in such agreement.

On September 12, 1973, the Wood Song trust purchased the Brewster property from the Nauset Trust for approximately $357,000. On the same day, the trustees of Wood Song signed a $500,000 mortgage note with the Bass River Bank. Such note was personally guaranteed by the petitioner who waived demand and notice, and such note was secured by a mortgage on the Brewster property.

During the years 1973 through 1975, the Wood Song trust engaged in the development of the Brewster property for resale. During such time, the petitioner worked with various contractors to construct roads on the property and to install utilities; he assisted the broker in the promotion of sales; he had prepared a brochure for the sale of the lots in the property; and he placed

advertisements for the lots in magazines. He spent most of his weekends and one weekday morning on the development and sale of the Brewster property. The trust sold two lots in 1973, three lots in 1974, and five lots in 1975.

On August 2, 1974, the trust signed an agreement with David A. Bourne for his purchase of five lots of the Brewster property for $48,195, but the trust agreed to reduce the purchase price by approximately 10 percent if roads were not constructed on the property within a specified period of time. There is no evidence as to when the property was transferred to Mr. Bourne. However, on January 28, 1975, he executed a mortgage securing his note to the trust; later the amount of such mortgage was reduced because the roads were not built. The sale to Mr. Bourne was not reported by Wood Song on its Federal income tax returns for 1974 or 1975.

On November 4, 1975, a judgment of foreclosure sale was entered for the Bass River Bank against the trustees of Wood Song for the balance of $506,448.34 due on the mortgage note at that time. Such balance included $43,668.12 in interest and $14,312.10 in real estate taxes owed by the trust on such date. The bank subsequently acquired the Brewster property in 1975 for $200,000 at a public auction. The adjusted proceeds of such foreclosure sale were $192,491.46. The petitioner received no money when the property was foreclosed upon by the Bass River Bank. On February 17, 1976, the bank made demand against the Wood Song trustees for the balance of $313,956.88 outstanding on the note after the foreclosure sale, and on March 2, 1976, the bank made demand against the petitioner individually for such balance. The Bass River Bank then brought suit against the petitioner when the balance was not paid by March 16, 1976. As of the date of trial of this case, such suit had not been concluded, and the petitioner had not paid anything to the Bass River Bank on his guarantee.

On their Federal income tax returns for 1973, 1974, 1975, and 1976, the petitioners, Mr. and Mrs. Hynes, deducted the following amounts as business expenses which are at issue in this case:

| Expense | 1973 | 1974 | 1975 | 1976 |
|---|---|---|---|---|
| Wardrobe | $655 | $300 | $500 | --- |
| Haircuts and makeup | 96 | 110 | 120 | $120 |

| | | | |
|---|---|---|---|
| Laundry, dry cleaning, shirt cleaning ......................$252 | $295 | $305 | $175 |
| Hotels.......................................... 1,835 | 2,200 | 3,150 | |
| Home office.....................................................963 | | | |
| Meals.........................................................4,080 | | | |
| Automobile ...............................................2,696 | 2,689 | | |
| Automobile depreciation ...............................3,316 | 3,316 | | |

In his notices of deficiency, the Commissioner disallowed in full the petitioners' deductions for wardrobe, haircuts and makeup, laundry, dry cleaning, and shirt cleaning, hotels, and a home office on the ground that they were not ordinary and necessary business expenses. He also disallowed a portion of the deductions for automobile expenses, automobile depreciation, and meals, on the ground that the petitioners did not substantiate the claimed deductions beyond the amounts allowed by him.

On its Federal income tax returns for 1973, 1974, and 1975, the Wood Song trust reported gross receipts and losses in the following amounts:

| Year | Gross receipts | Losses |
|---|---|---|
| 1973 | $26,820 | $8,497 |
| 1974 | 35,000 | 40,530 |
| 1975 | --- | 19,674 |

On their Federal income tax returns for such years, the petitioners, Mr. and Mrs. Hynes, claimed deductions for the losses reported by the trust.

On their Federal income tax return for 1976, the petitioners, Mr. and Mrs. Hynes, deducted $313,957 as a business bad debt arising from the bank's foreclosure on the Brewster property. On such return, they also deducted interest of $43,668 and real estate taxes of $14,312. Such amounts represent the interest and real estate taxes owed by the Wood Song trust when the bank foreclosed on its mortgage. On April 15, 1977, such petitioners filed an application requesting tentative refunds of $10,894 for 1973, $228 for 1974, and $2,648 for 1975 based on the carryback of a net operating loss of $313,957 in 1976. Such refunds were made to the petitioners. In his notice of deficiency, the Commissioner disallowed such deductions claimed for 1976 and the carryback of the net operating loss.

In his notice of deficiency to the Wood Song trust for 1975, the Commissioner determined that the trust failed to report on its

tax return for such year income of $48,195 from the sale of real estate. He also determined that the trust realized gain on the foreclosure of the Brewster property by the Bass River Bank, but he now concedes that such determination was improper.

## OPINION

The first issue in this case is whether the Wood Song trust is an association taxable as a corporation. The petitioners maintain that the Wood Song trust is not such an association and that under section 671, the petitioner is required to report the income or losses of such a trust.

Ordinarily, a trust and its beneficiaries are subject to the provisions of subchapter J of the Code (secs. 641 et seq.), which, generally speaking, provide for "passthrough" treatment of the trust. However, section 7701(a)(3) provides that for Federal tax purposes, the term corporation includes associations. The question of when a trust constitutes an association taxable as a corporation has long been the subject of controversy. In *Crocker v. Malley*, 249 U.S. 223 (1919), one of the first cases in which the Supreme Court addressed the issue, the Court considered a trust which had been created by a paper manufacturing corporation for the purpose of liquidating the corporation's assets and distributing the proceeds to the beneficiaries over a period of time at the discretion of the trustees. The Court observed: "The function of the trustees is not to manage the mills but simply to collect the rents and income of such property as may be in their hands, with a large discretion in the application of it, but with a recognition that the receipt holders [beneficiaries] are entitled to it subject to the exercise of the powers confided to the trustees." 249 U.S. at 232. The Supreme Court held that an ordinary trust and not an association had been created since the beneficiaries exercised no joint control over the trust fund.

In 1924, the Supreme Court ruled once again on the issue and limited its holding in *Crocker* to situations where trustees merely hold property for the passive production of income. In *Hecht v. Malley*, 265 U.S. 144 (1924), the Court held that where trustees engage in business in quasi-corporate form, the trust is taxable as a corporation. The Court considered three separate trusts—a real estate trust for the management of family property, a real estate trust created by investors for the purchase and operation of an office building, and a trust for the ownership and

operation of a paper mill—and concluded that such trusts were associations. The Supreme Court stated "that when the nature of the three trusts here involved is considered, as the petitioners are not merely trustees for collecting funds and paying them over, but are associated together in much the same manner as the directors in a corporation for the purpose of carrying on business enterprises, the trusts are to be deemed associations." 265 U.S. at 161. Thus, the distinction between an ordinary trust created to protect and conserve the trust property for the beneficiaries and a business trust created by the beneficiaries to carry on a profitmaking business in quasi-corporate form was established.

About a decade later, the Supreme Court elucidated this distinction in *Morrissey v. Commissioner*, 296 U.S. 344 (1935). In that case, a trust was created for the development of real estate and for the construction and operation of a golf course. The trustees were empowered to buy, sell, lease, and operate the land owned by the trust, to receive rents, profits, and income, and to make loans and investments. However, the trustees were without power to bind the beneficiaries personally. The interests of the beneficiaries in the trust were evidenced by transferable certificates for preferred and common shares, and their liability was limited to such interests. The trust was to continue for 25 years, unless sooner terminated by the trustees, and the death of a trustee or a beneficiary did not end the trust. A portion of the trust property was developed and sold, and the golf course was constructed and conveyed to a corporation in exchange for its stock. For a time, the trustees leased the golf course from the corporation and operated its facilities, but later, the activities of the trustees were confined to the collection of installments on previous sales, the sale of other parts of the trust land, the receipt of dividends from the golf course, and the disposition of money to the beneficiaries of the trust.

In *Morrissey*, the Supreme Court held that the trust was taxable as an association since it was a venture organized for the operation of a business for the benefit of the beneficiaries. The Court set the tone of its reasoning by stating that "The inclusion of associations with corporations implies resemblance; but it is resemblance and not indentity." 296 U.S. at 357. The Court then offered the following guidance with respect to the criteria it considered indicative of a trust taxable as an association:

What, then, are the salient features of a trust—when created and maintained as a medium for the carrying on of a business enterprise and sharing its gains—which may be regarded as making it analogous to a corporate organization? A corporation, as an entity, holds the title to the property embarked in the corporate undertaking. Trustees, as a continuing body with provision for succession, may afford a corresponding advantage during the existence of the trust. Corporate organization furnishes the opportunity for a *centralized management* through representatives of the members of the corporation. The designation of trustees, who are charged with the conduct of an enterprise,—who act "in much the same manner as directors"—may provide a similar scheme, with corresponding effectiveness. Whether the trustees are named in the trust instrument with power to select successors, so as to constitute a self-perpetuating body, or are selected by, or with the advice of, those beneficially interested in the undertaking, centralization of management analogous to that of corporate activities may be achieved. An enterprise carried on by means of a trust may be *secure from termination or interruption by the death of owners of beneficial interests* and in this respect their interests are distinguished from those of partners and are akin to the interests of members of a corporation. And the trust type of organization facilitates, as does corporate organization, *the transfer of beneficial interests* without affecting the continuity of the enterprise, and also the introduction of large numbers of participants. The trust method also permits *the limitation of the personal liability of participants* to the property embarked in the undertaking. [296 U.S. at 359; emphasis supplied.]

Centralization of management, continuity of life, transferability of interests, and limited liability were thus established by *Morrissey* as the benchmarks for judging corporate resemblance. The Treasury regulations have relied on such criteria for determining when an organization is to be classified as an association for Federal tax purposes. In part, section 301.7701–2(a)(1), Proced. & Admin. Regs., provides:

There are a number of major characteristics ordinarily found in a pure corporation which, taken together, distinguish it from other organizations. These are: (i) Associates, (ii) an objective to carry on business and divide the gains therefrom, (iii) continuity of life, (iv) centralization of management, (v) liability for corporate debts limited to corporate property, and (vi) free transferability of interests. Whether a particular organization is to be classified as an association must be determined by taking into account the presence or absence of each of these corporate characteristics. The presence or absence of these characteristics will depend upon the facts in each individual case. * * * An organization will be treated as an association if the corporate characteristics are such that the organization more nearly resembles a corporation than a partnership or trust. See Morrissey et al. v. Commissioner (1935) 296 U.S. 344.

The petitioner argues that the Wood Song trust fails to meet

the six criteria established in the regulations. Particularly, he vigorously contends that under section 301.7701–2(a)(2), Proced. & Admin. Regs., having associates and an objective to carry on business for joint profit are essential characteristics of any taxable association and that the Wood Song trust lacked such characteristics. He maintains that there were no associates since he was the sole grantor and beneficiary and since the other trustees acted merely as his agents and that, although the trust was carrying on a business for profit, there was no sharing of such profits since he held all the shares of beneficial ownership. After careful consideration of all the facts and circumstances in this case, we must disagree with the petitioner, for the ultimate test "is resemblance and not identity" to corporate form. *Morrissey v. Commissioner,* 296 U.S. at 357; sec. 301.7701–2(a)(1), Proced. & Admin. Regs.; see also R. Barrett & J. DeValpine, "Taxation of Business Trusts and Other Unincorporated Massachusetts Entities with Transferable Shares," 40 B.U. L. Rev. 329, 334 (1960).

### 1. *and* 2. *Associates—Objective to Carry on a Business for Joint Profit*

Section 301.7701–2(a)(2), Proced. & Admin. Regs., declares in part:

> (2) Since associates and an objective to carry on business for joint profit are essential characteristics of all organizations engaged in business for profit (*other than the so-called one-man corporation* and the sole proprietorship), the absence of either of these essential characteristics will cause an arrangement among co-owners of property for the development of such property for the separate profit of each not to be classified as an association. * * * [Emphasis supplied.]

A careful reading of such regulation shows that it does not support the petitioner's position. In referring to the plural "associates" and the division of profits, the provision expressly excepts a one-man corporation from such references. By implication, the regulation recognizes that when there is a single owner, there will not be associates or a sharing of the profits among associates. The requirements of associates and the division of a profit serve to distinguish a taxable association from a coownership of property in which the coowners are entitled to their separate shares of the income from the property. It is clear that

when there is a single owner, the regulations are not intended to require multiple associates or a sharing of profits among them.

Whether an organization has associates and an objective to carry on business for joint profit are related characteristics. The term "associates" refers to those persons who have a beneficial ownership in a business. *Crocker v. Malley*, 249 U.S. at 234; see also *Morrissey v. Commissioner*, 296 U.S. at 356–357. Thus, we are not concerned with whether the other trustees were associates. We are only concerned with whether such trust is not to be treated as an association since the petitioner was the sole owner thereof. It has long been held that the classification of an organization as an association does not depend on the number of beneficiaries. In *Lombard Trustees v. Commissioner*, 136 F.2d 22 (9th Cir. 1943), the Court of Appeals held that a trust with only one beneficiary was taxable as an association. The court stated: "We regard the plural word 'beneficiaries' as inclusive of the singular. * * * If petitioner's contention were correct, it could as well be argued that there could be no trust taxation where there is but a single cestui." 136 F.2d at 23. In *Swanson v. Commissioner*, 296 U.S. 362 (1935), the Supreme Court held that two beneficiaries were sufficient to constitute an association, and in *Helvering v. Coleman-Gilbert*, 296 U.S. 369 (1935), the Supreme Court held that five beneficiaries constituted an association.

For his own reasons, the petitioner chose not to carry on the business of developing and selling the Brewster property in his own name; instead, he set up the trust, managed the business as one of the trustees, and took all the shares of beneficial ownership. Thus, the trust was not merely protecting property and collecting the income for the beneficiaries; it was engaged in carrying on a business for profit. *Hecht v. Malley, supra.* Although the trust stood to realize, in the first instance, any profits from the business, such profits were under the control of the petitioner, and he could demand their distribution to him at any time. An associate is like a shareholder of a corporation who provides the capital for the business carried on by the corporation and who has a right to receive the profits of the business. The petitioner stood in exactly that same relationship to the business carried on by the Wood Song trust. *Morrissey v. Commissioner*, 296 U.S. at 357. Accordingly, we hold that such trust had associates and an objective to carry on business for joint profit.

Such conclusion is wholly consistent with our decision in *Knoxville Truck Sales & Service, Inc. v. Commissioner,* 10 T.C. 616 (1948). In that case, the charter of a corporation was revoked, but the owner of the business was unaware of the revocation and continued to operate the business under the corporate name. We held that after the revocation of the charter, the business was operated as a sole proprietorship and that a proprietorship cannot be treated as an association for tax purposes. 10 T.C. 622. However, in reaching such conclusion, we referred to the decision of the Ninth Circuit in *Lombard Trustees v. Commissioner, supra,* and distinguished that case on the grounds that it involved a business trust with a beneficiary. 10 T.C. 622. Thus, we recognized that our decision in *Knoxville* did not apply where a business is owned and operated by a trust for the benefit of a beneficiary.

### 3. *Continuity of Life*

Section 301.7701–2(b), Proced. & Admin. Regs., provides in part:

(b) *Continuity of life.* (1) An organization has continuity of life if the death, insanity, bankruptcy, retirement, resignation, or expulsion of any member will not cause a dissolution of the organization. * * *

\* \* \* \* \* \* \*

(3) An agreement establishing an organization may provide that the organization is to continue for a stated period or until the completion of a stated undertaking or such agreement may provide for the termination of the organization at will or otherwise. * * * if the agreement provides that the organization is to continue for a stated period or until the completion of a stated transaction, the organization has continuity of life if the effect of the agreement is that no member has the power to dissolve the organization in contravention of the agreement. * * *

The petitioner contends that the Wood Song trust lacked continuity of life "because the death of any member, namely the last living original trustee, would dissolve the trust at that time." We must disagree, for the petitioner's contention is clearly contrary to the articles establishing the trust.

Article 2 of the trust agreement provides that "The death[,] resignation or incapacity of any of the Trustees shall not terminate the Trust or in any way affect its continuity." Article 9, paragraph II, of such agreement provides that the death, insolvency, or incompetancy of one or more of the beneficiaries

or the transfer of shares does not terminate the trust. Article 14 of the trust agreement provides that the trust will terminate 20 years after the death of all the original trustees, unless terminated sooner by a majority vote of the trustess.

Under these provisions of the trust agreement, it is clear that the trust is to continue for a stated period, that is, until 20 years after the death of all the original trustees. It is not to terminate on the death of any single trustee, nor can the petitioner dissolve it at will. Accordingly, the Wood Song trust had continuity of life within the meaning of section 301.7701-2(b).

### 4. *Centralization of Management*

Section 301.7701-2(c), Proced. & Admin. Regs., defines centralization of management by providing in part:

(c) *Centralization of management.* (1) An organization has centralized management if any person (or any group of persons which does not include all the members) has continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the organization was formed. Thus, the persons who are vested with such management authority resemble in powers and functions the directors of a statutory corporation. * * *

\* \* \* \* \* \* \*

(3) Centralized management means a concentration of continuing exclusive authority to make independent business decisions on behalf of the organization which do not require ratification by members of such organization. Thus, there is not centralized management when the centralized authority is merely to perform ministerial acts as an agent at the direction of a principal.

The petitioner takes the position that the Wood Song trust lacked centralization of management because the other two trustees served as his agents and merely performed ministerial acts. He relies on *A. A. Lewis & Co. v. Commissioner*, 301 U.S. 385 (1937), in which the Court held that since the trustees performed purely ministerial duties for the settlor, the trust was not taxable as an association. However, in that case, the question was whether the trust was carrying on business, and the Court found that it was not. In this case, we have already concluded that the Wood Song trust was carrying on business, and the issue now to be decided is whether the trustees, whether acting singly or collectively, had the continuing authority to manage the business in a manner resembling the management of a corporate business by a board of directors.

Article 5 of the trust agreement clearly provides that "The Trustees shall have full and absolute power, control and authority over the Trust property * * * to the same extent as if the Trustees were the sole owners of such property * * * exercisable without the consent of the Beneficiaries." Article 3 merely required that a majority vote of the trustees was necessary to validate any action by them. However, at a trust meeting on September 30, 1973, the trustees voted unanimously that any one trustee could execute documents which would bind the trust on all matters regarding the sale of the Brewster property.

These provisions of the trust agreement show that the trustees had broad powers to act on behalf of the trust, that their authority was not limited to purely ministerial acts, and that their actions did not require ratification by the beneficiary. It is immaterial whether, in reality, the petitioner could make the decisions for all the trustees; the significant fact is that the trustees had the power to act for the trust. See *Helvering v. Coleman-Gilbert*, 296 U.S. at 374. Hence, we hold that the Wood Song trust had centralization of management.

### 5. *Limited Liability*

Section 301.7701–2(d)(1), Proced. & Admin. Regs., states in part:

(d) *Limited liability.* (1) An organization has the corporate characteristic of limited liability if under local law there is no member who is personally liable for the debts of or claims against the organization. * * *

It is unclear whether the word "member" in the regulations refers to trustees or beneficiaries of a trust. The general rule of trusts provides that the trustees and not the beneficiaries may be liable for debts incurred in the administration of a trust. G. Bogert, Trusts and Trustees, ch. 14, sec. 247G, p. 163 (2d ed. 1977 rev.). However, the Supreme Court, in its opinion in *Morrissey v. Commissioner*, 296 U.S. at 359, implied that in judging whether there is personal liability, we look to the liability of the participants or the beneficiaries of the trust. Therefore, in our consideration of this criteria, we will examine the liability of both the trustees and the beneficiary of the Wood Song trust.

The petitioner contends that the trustees of Wood Song could not limit their liability under Massachusetts law, despite the

trust articles which purport to limit their liability. The cases cited by him do not support his position, and he is clearly wrong. The statement of Massachusetts law on this issue is best summarized by the Supreme Judicial Court of Massachusetts in *Larson v. Sylvester*, 282 Mass. 352, 185 N.E. 44, 46 (1933):

That a trustee can exempt himself from personal liability by stipulation or agreement is well established, Shoe & Leather National Bank v. Dix, 123 Mass. 148, 25 Am. Rep. 49, Carr v. Leahy, 217 Mass. 438, 105 N.E. 445, Neville v. Gifford, 242 Mass. 124, 136 N.E. 160; but a signature as "trustee" or a description of himself as "trustee" does not constitute such an agreement. Philip Carey Co. v. Pingree, 223 Mass. 352, 111 N.E. 857. * * *

Thus, a trustee in Massachusetts can limit his liability if the trust instrument so provides, if he stipulates to that effect when contracting on the part of the trust, and if the contracting party is aware of such provision. *James Stewart & Co. v. National Shawmut Bank*, 75 F.2d 148, 149 (1st Cir. 1935), and cases cited therein. Articles 7, 8, and 10 of the Wood Song trust agreement clearly provide for the limited liability of the trustees.

In addition, we are of the opinion that the petitioner also limited his liability as sole beneficiary under the trust agreement and that such limitation would be recognized under Massachusetts law. In *Greco v. Hubbard*, 252 Mass. 37, 147 N.E. 272 (1925), the Supreme Judicial Court of Massachusetts recognized that beneficiaries of a trust are in a position similar to shareholders in a corporation and, as such, can limit their liability. The court stated:

If the Winthrop Club Associates had been a corporation, no one would contend that the relation of the defendants to it by electing new officers after they became the stockholders would render them personally liable for its debts. Instead of being stockholders in a corporation, they are the cestuis que trust of a valid trust because they held all its shares. Every intendment of the law is toward the protection of cestuis que trust under a valid trust. [147 N.E. at 275.]

See also *Helm & Smith Syndicate v. Commissioner*, 136 F.2d 440, 441 (9th Cir. 1943). Articles 7, 8, and 10 of the Wood Song trust agreement clearly provide that the liability of the sole beneficiary is limited to the assets of the trust.

It has been held that where beneficiaries have the power to remove and replace trustees and to modify the terms of the trust agreement, then liability can be imposed upon them in many jurisdictions. G. Bogert, Trusts and Trustees, ch. 14, sec. 247H, p. 167 (2d ed. 1977 rev.); G. Bogert, Trusts and Trustees, ch. 33, sec.

721, p. 511 (2d ed. 1960). However, under the Wood Song trust agreement, the petitioner as sole beneficiary did not have such powers. We have also considered the possibility "that a creditor of the trust might be able to reach the beneficiary through the trustee, on the theory that the latter has a right to be indemnified by the beneficiary and that the creditor can go through the trustee against the beneficiary." G. Bogert, Trusts and Trustees, ch. 14, sec. 247G, p. 166 (2d ed. 1977 rev.). However, article 8, paragraph II, of the Wood Song trust agreement stated that the trustees have no right of indemnity or exoneration against the shareholders. Therefore, such exceptions to the general rule that trust beneficiaries have limited liability have no application in this case.

Furthermore, the fact that the petitioner is personally liable on the mortgage note to the Bass River Bank does not vitiate his limited liability as a trustee or as the beneficiary of Wood Song. He undertook the guarantee in his individual capacity and not as trustee or beneficiary. It is not uncommon for a lender to require a sole shareholder to personally guarantee a corporate loan. Accordingly, we hold that both the trustees and the beneficiary of the Wood Song trust had limited liability under Massachusetts law.

## 6. *Free Transferability of Interests*

Section 301.7701–2(e), Proced. & Admin. Regs., provides in part:

(e) *Free transferability of interests.* (1) An organization has the corporate characteristic of free transferability of interests if each of its members or those members owning substantially all of the interests in the organization have the power, without the consent of other members, to substitute for themselves in the same organization a person who is not a member of the organization. In order for this power of substitution to exist in the corporate sense, the member must be able, without the consent of other members, to confer upon his substitute all the attributes of his interest in the organization. * * *

The Commissioner concedes that the Wood Song trust has only a modified form of transferability of interests since the trust shares could only be transferred upon the unanimous decision of the trustees, but he does maintain that the trust does have a modified form of such characteristic since a transfer did not require the approval of other beneficiaries.

We need not decide whether the Wood Song trust has even a

modified form of transferable interests since our ultimate conclusion is clear regardless of whether the trust possesses that characteristic. Section 301.7701–2(a)(3), Proced. & Admin. Regs., provides in part that "An unincorporated organization shall not be classified as an association unless such organization has more corporate characteristics than noncorporate characteristics." We have already held that the Wood Song trust clearly possessed five of the corporate characteristics. Under such circumstances, we are confident that the Wood Song trust constituted an association taxable as a corporation since it possessed "more corporate characteristics than noncorporate characteristics." *Morrissey v. Commissioner, supra.* Accordingly, we hold that the petitioners, Mr. and Mrs. Hynes, are not entitled to deduct on their Federal income tax returns the losses incurred by the trust during 1973, 1974, and 1975, since the trust is a separate taxable entity.

The second issue for decision is whether the petitioners, Mr. and Mrs. Hynes, are entitled to deduct the $313,957 balance outstanding on the mortgage against the Wood Song trust after the foreclosure and sale of the Brewster property by the Bass River Bank. On their tax return for 1976, the petitioners referred to such deduction as both a "business bad debt" and a "business loss." In their brief, they now maintain that such loss is deductible as a business loss under section 165(c)(1). We disagree on several grounds.

Section 165(a) allows a deduction for any loss sustained during the taxable year that is not compensated for by insurance or otherwise, but section 165(c) limits the deductions allowable to individuals. Section 165(c)(1) allows an individual a deduction for a loss incurred in a trade or business. However, the deduction for bad debts is governed by section 166(a), which allows a deduction for a debt which becomes worthless during the taxable year.

In *Putnam v. Commissioner,* 352 U.S. 82 (1956), the Supreme Court held that a loss sustained by a guarantor unable to recover from the debtor is a loss from a bad debt to which the guarantor becomes subrogated upon discharging his liability as guarantor. The facts in this case vividly demonstrate that the petitioner was the *guarantor* of the mortgage for the trust. Hence, any loss sustained by him was not sustained upon the foreclosure of the Brewster property by the Bass River Bank. In *Spring City Foundry Co. v. Commissioner,* 292 U.S. 182 (1934), the Supreme

Court held that the predecessors of sections 165 and 166 are mutually exclusive; that is, a bad debt, although a loss, cannot be deducted under the general loss provisions of section 165. Therefore, the petitioner is clearly not entitled to a business loss deduction under section 165(c)(1).

Moreover, for several reasons, the petitioner is not entitled to any deduction under section 166. As a first matter, the petitioner admitted that, as of the time of trial, he had paid nothing to the Bass River Bank under his guarantee. In addition, to deduct a business bad debt under section 166, the petitioner must establish that his "dominant motivation" for guaranteeing the loan had a "proximate" relationship to his trade or business. *United States v. Generes*, 405 U.S. 93 (1972). On this record, the petitioner has utterly failed to establish that he suffered any loss in 1976 and that any loss for a bad debt should be treated as a business loss. Accordingly, we must conclude and hold that the petitioners, Mr. and Mrs. Hynes, are not entitled to any deduction for a loss of $313,957 in 1976. Such holding also means that such petitioners are not entitled to the carryback of a net operating loss claimed by them.

The third issue for our consideration is whether the petitioners, Mr. and Mrs. Hynes, are entitled to deduct in 1976 the interest and real estate taxes owed by the Wood Song trust on the date of the foreclosure of its property by the Bass River Bank. The bank included $43,668.12 for interest and $14,312.10 for real estate taxes as part of the total amount due under the mortgage note executed by the trust and guaranteed by the petitioner. As such, the amounts for interest and real estate taxes represent a component of the total amount which the bank seeks to collect from the petitioner under his guarantee.

Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." It has long been established that for interest to be deductible under section 163(a), the interest must be on the taxpayer's own indebtedness and not on the indebtedness of another. The interest must be paid or accrued on a valid obligation of the taxpayer claiming the deduction. *Golder v. Commissioner*, 604 F.2d 34 (9th Cir. 1979), affg. a Memorandum Opinion of this Court; *Nelson v. Commissioner*, 281 F.2d 1 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; *Rushing v. Commmissioner*, 58 T.C. 996 (1972); *Griffin v. Commissioner*, 7 B.T.A. 1094 (1927). In *Rushing*

*v. Commissioner, supra,* this Court held that no deduction was allowable under section 163 for interest where taxpayers, who were shareholders of a corporation, paid interest to the lender in connection with the guarantee of the corporation's notes. The Court stated that "a deduction for interest cannot be taken unless the interest was owed on an indebtedness of the taxpayer. The indebtedness upon which the interest arises in the guarantee situation is that of the primary obligor, not the guarantor, and the intention of the statute is to deny the deduction where the 'liability is secondary or indirect.' " 58 T.C. at 1000. In the present case, the obligation under the mortgage note was that of Wood Song trust. The trustees signed the mortgage on behalf of the trust, and the trust was the primary obligor. As such, it alone might be entitled to a deduction for the interest due under the note.

The petitioner relies on the provisions of section 1.163–1(b), Income Tax Regs., which provides in part: "Interest paid by the taxpayer on a mortgage upon real estate of which he is the legal or equitable owner, even though the taxpayer is not directly liable upon the bond or note secured by such mortgage, may be deducted as interest on his indebtedness." In the first place, the record shows that the petitioner was not the legal or equitable owner of the Brewster property; the Wood Song trust was the owner of such property. Moreover, as the Ninth Circuit stated in *Golder v. Commissioner,* 604 F.2d at 36: "section 1.163–1(b) does nothing more than permit the deduction of interest in situations where the taxpayer-borrower is not personally liable on a mortgage of property which is used as security for a *loan made to the taxpayer.*" (Emphasis in original.) The mortgage loan in this case was made to the trust, not to the petitioner. Thus, section 1.163–1(b) does not support his position.

Furthermore, there is no evidence that the petitioner ever paid the interest at issue. Such amount was merely part of the total obligation the petitioner owed to the Bass River Bank under his guarantee, and he testified that he had paid nothing to the bank under such guarantee as of the date of trial. Consequently, we must hold that the petitioners, Mr. and Mrs. Hynes, are not entitled to a deduction for the amount of interest due under the mortgage note of the trust on the date of foreclosure.

With respect to the claimed deduction for real estate taxes, section 164(a) allows "as a deduction for the taxable year within

which paid or accrued * * * real property taxes." However, section 1.164–1(a), Income Tax Regs., provides: "In general, taxes are deductible only by the person upon whom they are imposed." *Magruder v. Supplee*, 316 U.S. 394 (1942); *Cramer v. Commissioner*, 55 T.C. 1125, 1130 (1971). Under Massachusetts law, real estate taxes are imposed on the legal owner of the property or, in some instances, on the person in possession of the property. Mass. Ann. Laws ch. 59, sec. 11 (Law. Co-op 1978). In the situation where property is held by a trust, the Supreme Judicial Court of Massachusetts has stated "that one holding title as trustee is the owner." *Animal Rescue League of Boston v. Bourne's Assessors*, 310 Mass. 330, 37 N.E.2d 1019, 1021 (1941), and the cases cited therein; *Assessors of Boston v. Neal*, 311 Mass. 192, 40 N.E.2d 893, 895 (1942).

The facts in this case demonstrate that the Wood Song trust purchased the Brewster property from the Nauset Trust and that the Wood Song trust was the owner of such property. Therefore, under the law of Massachusetts, the petitioner was neither the legal nor equitable owner of the property in his individual capacity. Hence, we must hold that the petitioners, Mr. and Mrs. Hynes, may not deduct the real estate taxes imposed on the trust.

The fourth issue we consider is whether the petitioner is entitled to deduct as business expenses certain expenditures for his wardrobe, laundry and dry cleaning of such attire, haircuts and makeup, hotels and meals, and the operation of his automobile. The resolution of this issue requires us to reconcile the provisions of sections 262 and 162. Section 262 expressly denies a deduction for all "personal, living, or family expenses." On the other hand, section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business." Whether expenditures are for ordinary and necessary business expenses is a question of fact (*Commissioner v. Heininger*, 320 U.S. 467 (1943)), and the petitioner has the burden of demonstrating that the purpose of the expenditure was primarily business rather than personal and that the business in which the taxpayer is engaged benefited, or was intended to be benefited, by the expenditure. *Chapman v. Commissioner*, 48 T.C. 358 (1967); *Bennett's Travel Bureau, Inc. v. Commissioner*, 29 T.C. 350 (1957).

In deciding this issue, we first consider the petitioner's

deductions for the cost of his wardrobe and its maintenance. Although a business wardrobe is a necessary condition of employment, the cost of such wardrobe has generally been considered a nondeductible personal expense within the meaning of section 262. See *Kennedy v. Commissioner*, 451 F.2d 1023 (3d Cir. 1971), affg. per curiam a Memorandum Opinion of this Court, cert. denied 406 U.S. 920 (1972); *Motch v. Commissioner*, 11 T.C. 777 (1948), revd. on other issues 180 F.2d 859 (6th Cir. 1950). The general rule of law is that where business clothes are suitable for general wear, a deduction for them is not allowable. See *Donnelly v. Commissioner*, 262 F.2d 411 (2d Cir. 1959), affg. 28 T.C. 1278 (1957); *Roth v. Commissioner*, 17 T.C. 1450 (1952); *Roberts v. Commissioner*, 10 T.C. 581 (1948), affd. on another issue 176 F.2d 221 (9th Cir. 1949); *Drill v. Commissioner*, 8 T.C. 902 (1947). Such costs are not deductible even when it has been shown that the particular clothes would not have been purchased but for the employment. *Stiner v. United States*, 524 F.2d 640 (10th Cir. 1975); *Donnelly v. Commissioner, supra.*

There are recognized exceptions to the general rule, and this Court has allowed a deduction for the cost of clothes which were useful only in the business environment. For example, a deduction was allowed in *Harsaghy v. Commissioner*, 2 T.C. 484 (1943), because custom and usage forbade offduty wearing of the clothing; in *Meier v. Commissioner*, 2 T.C. 458 (1943), because sanitary considerations made the clothes unsuitable for general wear; in *Denny v. Commissioner*, 33 B.T.A. 738 (1935), because the clothes were a theatrical costume; and in *Mortrud v. Commissioner*, 44 T.C. 208 (1965), and *Benson v. Commissioner*, 2 T.C. 12 (1943), affd. 146 F.2d 191 (9th Cir. 1944), because the clothes were a uniform not expected to be worn generally. In *Yeomans v. Commissioner*, 30 T.C. 757, 767 (1958), we established three criteria for the cost of clothing to be deductible as an ordinary and necessary business expense: (1) The clothing is required or essential in the taxpayer's employment, (2) the clothing is not suitable for general or personal wear, and (3) the clothing is not so worn. In addition, if the cost of acquiring clothing is deductible, then the cost of maintaining such clothing is likewise deductible as an ordinary and necessary business expense. *Mortrud v. Commissioner, supra; Fisher v. Commissioner*, 23 T.C. 218 (1954), affd. 230 F.2d 79 (7th Cir. 1956);

*Harsaghy v. Commissioner, supra; Benson v. Commissioner, supra.*

In the present case, the petitioner contends that he is entitled to deduct the expense of his business wardrobe because he was restricted in his selection of colors and patterns of such clothes and because he did not wear the clothes when he was not at the station on camera. We cannot agree with the petitioner. The restriction on the petitioner's selection of his business attire is not significantly different from that applicable to other business people who must limit their selection of business clothes to conservative styles and fashions. The petitioner testified that his clothes were essentially suitable for use in any professional capacity. This case is thus distinguishable from *Yeomans v. Commissioner, supra* at 768, where this Court allowed a taxpayer to deduct the cost of her business attire which we found to be "of the most advanced styles and fashions * * * which were not suited for her private and personal wear." The fact that the petitioner chose not to wear his business clothes when he was away from the station does not mean that such clothes were not suitable for his private and personal wear. Indeed, most people do not wear their business clothes at home. It is also irrelevant that the petitioner's employment contract with the station for 1978 now provides him with a clothing allowance. Such fact does not establish that the petitioner's expenses were business expenses during the years in issue.

The petitioner asserts that he is entitled to deduct the cost of maintaining his business wardrobe because he incurred excessive expenses in doing so, but he has failed to establish that his expenses were excessive. The petitioner occasionally may have changed his shirt between the 6 and 11 p.m. news broadcasts, thus resulting in a larger laundry bill than otherwise would have been incurred, but his practice is not different from other professional people who work long hours and prefer to freshen up by changing their shirts and otherwise making themselves comfortable before facing the evening ahead. Accordingly, we sustain the Commissioner's determination that the petitioner may not deduct the cost of his business wardrobe or the cost of cleaning and laundering such attire.

We next consider the petitioner's deductions for the cost of his haircuts and makeup. In *Drake v. Commissioner,* 52 T.C. 842 (1969), this Court held that an enlisted man in the U.S. Army

who was required to have his hair cut every 2 weeks could not deduct the cost of such haircuts since such expense was a nondeductible personal expense. We observed that expenses for one's grooming were inherently personal in nature and stated: "The fact that the Army may have required such grooming does not make the expenses therefor any less personal. The evidence showed that the Army's requirement was directed toward the maintenance by the petitioner of a high standard of personal appearance and not toward the accomplishment of the duties of his employment." 52 T.C. at 844. We can perceive no distinction between the situation in *Drake* and the situation in the present case. The fact that the petitioner's employment contract with the station required him to maintain a neat appearance does not put him beyond our rationale and holding in such case, nor does it elevate his expenses for personal grooming to a business expense. Accordingly, we sustain the Commissioner's disallowance of the petitioner's deduction for haircuts. As far as the petitioner's makeup costs are concerned, he has presented us with no evidence to establish which portion of the total amount deducted for haircuts and makeup during the years in issue were allocable solely to makeup. Accordingly, we must also disallow any deduction for that item since the petitioner has failed to meet his burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933).

As for the expenses for hotel rooms during 1974, 1975, and 1976, the petitioner appears to maintain that such expenditures are deductible as business expenses because it was more convenient for him to stay in hotels closer to the station, rather than commute the 90 miles from Chatham each day, and because he sometimes used such rooms to meet with people and to keep his filing box and personal papers there.[2] We cannot agree with the petitioner.

Again, we must draw a distinction between business expenses deductible under section 162(a) and personal expenses made nondeductible by section 262. More specifically, section 162(a)(2)[3]

---

[2] The petitioner does not contend that he had his principal place of business in Chatham or Brewster where he conducted his trust activities; therefore, we do not consider whether he could deduct his expenses in Needham in connection with a second place of business.

[3] Sec. 162(a)(2) provides:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary

provides a deduction for expenses for meals and lodging if such expenses are incurred by the taxpayer while traveling away from home. In 1946, the Supreme Court established three criteria for determining whether travel expenses are deductible: (1) The expense must be reasonable and necessary; (2) the expense must be incurred "while away from home"; and (3) the expense must be incurred in pursuit of a trade or business. *Commissioner v. Flowers*, 326 U.S. 465, 470 (1946). The purpose of the travel expense deduction under section 162(a)(2) is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." *Kroll v. Commissioner*, 49 T.C. 557, 562 (1968). "On the other hand, if a taxpayer chooses for personal reasons to maintain a family residence far from his principal place of employment, then his additional traveling and living expenses are incurred as a result of that personal choice, and are therefore not deductible." *Tucker v. Commissioner*, 55 T.C. 783, 786 (1971).

The facts of the present case clearly demonstrate that the hotel rooms rented by the petitioner were merely to provide him with a place to live which was closer to the station than his home 90 miles away in Chatham. The petitioner undoubtedly found it more convenient to be closer to his place of business during the work week, and he chose, as a matter of personal preference, not to commute from Chatham each day. Under such circumstances, his hotel expenses are nondeductible personal expenses. Nor do the facts support his contention that he used such rooms as a business office in which to conduct business meetings. It is clear from the petitioner's testimony that he lived in such rooms during the week and regarded them as his local residence. Furthermore, he presented no evidence regarding how often he used such rooms for business meetings, and thus, he has failed to demonstrate that he is entitled to deduct any portion of the rent as a business expense. Compare sec. 1.262–1(b)(3), Income Tax

---

expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\* \* \* \* \* \* \*

(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; \* \* \*

Regs. Therefore, we hold that the petitioner may not deduct any of his hotel expenses during 1974, 1975, and 1976, since they are nondeductible personal expenses under section 262.

The petitioner maintains that his expenses of $4,080 for meals in 1976 were deductible because such expenses were incurred in connection with his work at the station. The Commissioner allowed a deduction of $2,640 for such expenses, but he disallowed the remainder for lack of substantiation. We must agree with the Commissioner, for such business expenses are subject to the substantiation requirements of section 274(d), which provides in part:

> (d) SUBSTANTIATION REQUIRED.—No deduction shall be allowed—
>
> (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home),
>
> (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or
>
> \* \* \* \* \* \* \*
>
> unless the taxpayer substantiates by *adequate records or by sufficient evidence corroborating his own statement* (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility \* \* \* , (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility \* \* \* [Emphasis added.]

Under such provision, the elements of the petitioner's expenditures for meals must be substantiated by either "adequate records" or other "sufficient evidence" (sec. 1.274–5(c)(1), Income Tax Regs.), and any such expenditures not thus substantiated will be disallowed *in full. Sanford v. Commissioner*, 50 T.C. 823, 828 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969), cert. denied 396 U.S. 841 (1969).

Section 1.274–5(c)(2), Income Tax Regs., describes "adequate records" as consisting of "An account book, diary, statement of expense or similar record \* \* \* made at or near the time of the expenditure," and "documentary evidence \* \* \* [such as bills or receipts] which, in combination, are sufficient to establish each element of an expenditure." In the absence of such records, "the taxpayer may alternatively satisfy the substantiation requirements by coming forward with 'corroborative evidence sufficient' to support his own statement containing specific information in detail as to each element of the expenditure, or such elements as have not been substantiated by adequate records."

*Sanford v. Commissioner,* 50 T.C. at 829; sec. 1.274–5(c)(3), Income Tax Regs. The petitioner has the burden of proving that his expenditures are deductible under section 274(d). *Sanford v. Commissioner,* 50 T.C. at 826.

The petitioner presented no evidence, other than his relatively vague testimony, to support his contention that the full amount claimed by him for meal expenses is deductible under sections 162 and 274(d). He failed to present any evidence which establishes the amount, time, or place of his expenditures, and he presented no account book, diary, statement of expense, or similar record corroborating his testimony. *Bradley v. Commissioner,* 57 T.C. 1, 9 (1971). The substantiation requirements of section 274(d) required detailed recordkeeping, and the petitioner's testimony is insufficient, standing by itself, to support a deduction under such section since "it was the intention of Congress that no deduction should be allowed solely on the basis of a taxpayer's unsupported self-serving testimony." *Ashby v. Commissioner,* 50 T.C. 409, 415 (1968). In the absence of any such substantiation, we must hold that the petitioner has not carried his burden of proving that any expenditures for meals in excess of those allowed by the Commissioner are deductible. *Buddy Schoellkopf Products, Inc. v. Commissioner,* 65 T.C. 640, 660 (1975); *Bradley v. Commissioner, supra* at 10; *Sanford v. Commissioner,* 50 T.C. at 826.

Next, we consider the amounts deducted by the petitioner for the use and depreciation of his automobile during 1975 and 1976. He maintains that he often used his car to cover a story in connection with his work as a newsman at the station, to travel between his hotel and the station, and to travel between Needham and either Chatham or Brewster in connection with the development of the land for the trust. The Commissioner allowed a portion of the petitioner's expenses for automobile use and depreciation and disallowed the remainder for lack of substantiation.

We must uphold the Commissioner's determination on this issue, for the petitioner introduced no evidence to support his claim that the automobile expenses were incurred for business purposes. Indeed, his testimony revealed that a portion of the use of the car was for commuting between his hotel and work and for commuting between the station and his home in Chatham. It is well established that expenses incurred by a

taxpayer in commuting between his home and his place of business are personal and nondeductible. *Commissioner v. Flowers*, 326 U.S. at 473–474; *Heuer v. Commissioner*, 32 T.C. 947, 951–952 (1959), affd. per curiam 283 F.2d 865 (5th Cir. 1960). Expenses incurred on trips between two places of business are deductible as a business expense (*Steinhort v. Commissioner*, 335 F.2d 496, 503–504 (5th Cir. 1964), affg. and remanding a Memorandum Opinion of this Court; *Heuer v. Commissioner*, 32 T.C. at 953), but the petitioner has furnished no evidence to show how much of his travel may have been between places of business. For such reasons, we sustain the Commissioner's determination on this issue.

The fifth issue for decision is whether the petitioners, Mr. and Mrs. Hynes, are entitled to a deduction under section 280A for expenses incurred for the use of a room in their residence as a home office. They maintain that Mr. Hynes used such room in connection with his business as a TV newsman and that Mrs. Hynes used such room in connection with her real estate business.[4]

Section 280A was added to the Internal Revenue Code of 1954 by the Tax Reform Act of 1976, sec. 601(a), Pub. L. 94–455, 90 Stat. 1569,[5] to provide "definitive rules * * * governing the deductibility of expenses attributable to the maintenance of an office in the taxpayer's personal residence." S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 185; H. Rept. 94–658 (1975), 1976–3 C.B. (Vol. 2) 695, 852. Section 280A(a) sets forth the general rule relating to the deductibility of expenses attributable to the business use of a home:

(a) GENERAL RULE.—Except as otherwise provided in this section, in the case of a taxpayer who is an individual or an electing small business corporation, no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence.

---

[4]Mr. Hynes does not contend that he used the room in connection with his activities for the Wood Song trust. In his testimony at trial and in his argument on brief, he only maintained his entitlement to a home office deduction with relation to his trade or business as a newsman. Therefore, we do not consider his possible use of such room as an office for the trust. See *Curphey v. Commissioner*, 73 T.C. 766 (1980).

[5]Sec. 280A was made effective for taxable years beginning after Dec. 31, 1975.

The pertinent exceptions to this general rule are set forth in section 280A(c)(1), which provides:

(c) EXCEPTIONS FOR CERTAIN BUSINESS OR RENTAL USE; LIMITATION ON DEDUCTIONS FOR SUCH USE.—

(1) CERTAIN BUSINESS USE.—Subsection (a) shall not apply to any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis—

(A) as the taxpayer's principal place of business,

(B) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business, or

(C) in the case of a separate structure which is not attached to the dwelling unit, in connection with the taxpayer's trade or business.

In the case of an employee, the preceding sentence shall apply only if the exclusive use referred to in the preceding sentence is for the convenience of his employer.

The Commissioner urges that Mr. Hynes' principal place of business was at the station where he performed his duties as a newsman, and that the principal place of business of Mrs. Hynes was at her real estate office in Chatham. Therefore, he concludes that the petitioners are not entitled to a deduction under section 280A for any part of the expenses attributable to maintaining such office during 1976, and the petitioners have the burden of proving otherwise. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933). We must agree with the Commissioner's position.

In our recent decision in *Curphey v. Commissioner*, 73 T.C. 766, 776 (1980), we stated that "section 280A(c)(1)(A) requires a determination as to whether, with respect to a particular business conducted by a taxpayer, the home office was his principal place for conducting that business." Section 280A(c) is also clear that, in the case of an employee, the home office must be for the convenience of the employer. It is readily apparent from the facts in this case that Mr. Hynes' principal place of business as a newsman was at the television station. The duties of that job may have taken him on location to cover various news stories, but by no stretch of the imagination could a room in his residence be considered his place of business. Moreover, he has not demonstrated that he maintained his home office for the convenience of his employer, the television station.

The record in this case also does not support the petitioners' contention that their home office was the principal place of

business for the real estate activities of Mrs. Hynes. Mr. Hynes testified that Mrs. Hynes had a real estate office in Chatham and that she merely used the room in their residence to talk on the telephone with clients and to store some of her personal records. In light of such facts, we cannot conclude that the petitioners' home office was the principal place of business of Mrs. Hynes. Accordingly, we hold that under section 280A(a), the petitioners are not entitled to deduct any expenses attributable to their use of a room in their residence as a home office.

The last issue for our decision is whether the Wood Song trust failed to report income in 1975 from the sale of five lots of land to David A. Bourne. The Commissioner determined that Wood Song realized $48,195 of income in 1975 from such sale, but he also allowed the trust a deduction, which it had not claimed, of $19,252 as the cost of real estate sold. The burden is on the trust to prove that the Commissioner's determination is incorrect. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933).

The Wood Song trust contends that it did not receive the full price stated in the sales contract in 1975 because it had an agreement with Mr. Bourne to reduce the price of the property if it did not construct roads on the land within a specified period of time and because the price was later reduced in accordance with the agreement. The trust also claims that the Commissioner's determination regarding its gain on such sale fails to take into account various costs of transferring the land which totaled approximately $8,500. In addition, in its brief, the trust argues for the first time that such sale is entitled to the installment method of reporting gain under section 453. Again, we must reject the contentions of the trust for several reasons.

In the first place, it is well settled that this Court will not consider issues raised for the first time on brief when to do so prevents the opposing party from presenting evidence that he might have if the issue had been timely raised. *Estate of Horvath v. Commissioner*, 59 T.C. 551, 555 (1973); *Riss v. Commissioner*, 56 T.C. 388, 401 (1971), supplemental opinion 57 T.C. 469 (1971), affd. on this issue 478 F.2d 1160 (8th Cir. 1973); *Theatre Concessions, Inc. v. Commissioner*, 29 T.C. 754, 760–761 (1958). It is not clear from the record in this case that the Commissioner was fully apprised at or before the trial that the trust intended to claim section 453 treatment for the sale in issue.

Moreover, the trust has utterly failed to show that it was entitled to use section 453. That section permits gain from certain sales to be reported in the years in which payments on the sale are received, and not wholly in the year of sale, provided that either: (1) There are no payments in the taxable year of sale, or (2) the payments (exclusive of evidence of indebtedness of the purchaser) do not exceed 30 percent of the selling price. The trust introduced absolutely no evidence to establish what amount, if any, it received during the year of sale. The petitioner merely testified that he ultimately reduced the sales price to Mr. Bourne by approximately $5,000 under a previous agreement because roads had not been constructed on the property. Nor has the trust shown that it made a proper election to report the gain by use of the installment method under section 453. Sec. 1.453–8(b), Income Tax Regs.; *Bookwalter v. Mayer*, 345 F.2d 476 (8th Cir. 1965); *Reaver v. Commissioner*, 42 T.C. 72 (1964).

Finally, the contention that the Commissioner overlooked the costs of selling the real estate in determining the amount of gain on the sale is contradicted by the evidence. It is clear from the deficiency notice issued to the trust that the Commissioner allowed the trust a $19,252 deduction for such purpose. On this record, we must hold that the trust has failed to meet its burden of proving that the determination of the Commissioner was incorrect, and therefore, we sustain the Commissioner's determination on this issue.

*Decisions will be entered under Rule 155.*