EDWARD W. AND LEONA J. ANDREWS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Andrews v. Commissioner
Docket No. 15853-88
United States Tax Court
T.C. Memo 1990-391; 1990 Tax Ct. Memo LEXIS 404; 60 T.C.M. (CCH) 277; T.C.M. (RIA) 90391; July 25, 1990, Filed *404 Decision will be entered under Rule 155. *405 Raymond A. Snow, for the petitioners. Paul Colleran, for the respondent. JACOBS, Judge. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in petitioners' 1984 income tax in the amount of $ 10,915.69. The issues for decision are: (1) Whether respondent erred in disallowing a deduction which petitioners claimed for meals and lodging *406 expenses while away from home in the pursuit of a trade or business. We hold that he did not err. (2) Whether respondent erred in disallowing a depreciation deduction claimed for petitioner's Lighthouse Point, Florida home. We hold that he did not err. (3) Whether respondent erred in disallowing a deduction for depreciation and rental expenses claimed for petitioners' Pompano Beach, Florida condominum. We hold that he erred. (4) Whether respondent erred in disallowing a portion of a deduction which petitioners claimed as a home office expense. We hold that he did not err.
FINDINGS OF FACT Some of the facts have been stipulated and are so found. So much of the stipulation of facts and exhibits attached thereto as we find relevant are incorporated herein by this reference. Petitioners Edward W. Andrews and Leona J. Andrews, husband and wife, resided in Lynnfield, Massachusetts, at the time their petition was filed. Mrs. Andrews is a party to this proceeding only by virtue of having filed a joint return with her husband; accordingly, Mr. Andrews singularly will be referred to as petitioner. At all relevant times, petitioner was the president and *407 chief executive officer of Andrews Gunite Co., Inc. (Andrews Gunite or the corporation), a Massachusetts corporation engaged in the construction and sale of swimming pools in the New England area. Petitioner owned 55 percent of the stock of the corporation; his brother, Rodney, owned the remaining 45 percent. In 1984, petitioner's compensation from Andrews Gunite was $ 108,000. Due to the seasonal nature of the swimming pool business in the Northeast, commencing in 1964, petitioner used his "off -season time" to race and breed standardbred horses; this business activity was known as Andrews Farms. At first, these activities took place in the New England area (Massachusetts and New Hampshire); in 1972, the horse racing and breeding activities of Andrews Farms were moved to the Pompano, Florida area. Petitioner's horse racing and breeding business proliferated and prospered to the point where by 1975, he owned approximately 130 horses. Two of his horses, Bret's Champ and Bret's Star, were among the fastest, if not the fastest, harness race horses. In 1975, Bret's Champ won the Messenger Stake at Roosevelt Raceway which had a purse of $ 154,000. The success of Bret's Champ and *408 Bret's Star created a demand for the stud services of these horses. In 1976, petitioner had an ownership interest in Keystone Model, a world champion mare, to which Bret's Star was bred. The offspring was Ticket to Ride which on August 2, 1982, came in second in the Woodrow Wilson Race at the Meadowlands; that race had a purse of $ 1,957,500, which at the time was the largest in the history of horse racing. In 1974, Andrews Gunite diversified its business activities by establishing a Florida-based division, known as Pilgrim Farms, to acquire brood mares to breed with Bret's Star and Bret's Champ. The objective of the diversification was to utilize off-season time to develop a stable of horses for racing and breeding similar to that of Andrews Farms. By 1984, Pilgrim Farms had 20 to 30 horses. Petitioner was responsible for the management and training of Pilgrim Farms' horses. Pilgrim Farms' horses were boarded and trained at the Pompano Beach Raceway. Petitioner's only compensation for services rendered to Pilgrim Farms' activities was the payment of his airfare to Florida. He did not receive reimbursement for his other expenses. Petitioner was a "hands-on" owner. He selectively *409 trained those of his horses (and those of Pilgrim Farms) which he felt possessed the most promise. Attributable in part to a steady decline in the volume of pool construction business in the Northeast, and in part to utilize the productive winter months of the Florida climate, petitioner, his brother Rodney, and son Edward III decided to establish a pool business in Florida. (Edward III had worked for Andrews Gunite for a number of years. By 1983, there was "no room for him" at Andrews Gunite. By the summer of 1983, Edward III sought to either acquire an existing pool business in Florida or start a new one. Thereafter, he came upon an opportunity to acquire an existing, financially troubled pool business in the West Palm Beach area known as East Coast Pools.) In August 1983, petitioner, Rodney, and Edward III formed a corporation (originally known as East Coast Pools by Andrews, Inc. and subsequently renamed Pools by Andrews, Inc.) to purchase the assets of East Coast Pools; each owned one-third of the stock of the corporation. By October 1983, the acquisition of the assets of East Coast Pools had been accomplished and, by January 1984, Edward III (together with his father *410 and uncle, as their time would allow) completed all steps necessary to commence business operations. Petitioner assisted his son in the Florida pool business; however, he drew no salary for his services. (At the time of trial, Pools by Andrews had offices in both West Palm Beach and Orlando and plans for a third office in Tampa. It was one of the biggest, if not the biggest, builders of pools in Florida.) Prior to and during 1984, petitioners resided in Lynnfield, Massachusetts (the Lynnfield home). Their house contains 2,400 square feet of livable space and has eight rooms. Petitioner used one room, containing 120 square feet, as a home business office for Andrews Farms. The office contained a desk, telephone, file cabinets, and periodicals regarding horse racing and breeding. He deducted $ 1,162.76, one-eighth (12.5 percent) of the total maintenance expenses of the Lynnfield home (as home office expenses) on Schedule C (for his horse racing business) of his 1984 return. [1]
*411 The expansion of petitioner's horse business activities required petitioner to make an increasing number of trips to Florida. Over the years, not only did the cost of petitioner's lodging in Florida increase substantially, but lodging itself became more difficult to arrange. Thus, on August 1, 1976, petitioners purchased a unit in a condominium apartment building in Pompano Beach, Florida (the Pompano Beach condominium). Petitioner used this unit as a residence while on business in Florida during the racing season. The neighborhood around the condominium became unsafe, and in 1983 petitioner decided to move. He listed the unit for sale or rent with a local real estate broker. Sale of the unit was difficult due to the saturation of the Florida real estate market. Rental of the unit was also difficult since the condominium association's rules precluded the renting of condominium units on a seasonal basis. Petitioners were thus unable to sell or rent the unit in 1983 and 1984. (They eventually sold the unit in 1986 for a substantial gain.) Petitioners reported a $ 9,576.06 rental loss ($ 7,576.06 for expenses other than depreciation and $ 1,980 for depreciation) from the condominium *412 unit on their 1984 return. [2]
In April 1983, petitioners purchased a single family home with a swimming pool in Lighthouse Point, Florida (the Lighthouse Point house), where petitioner maintained, trained, and raced many of his horses and those of Pilgrim Farms. (The Lighthouse Point house was closer to the Pompano Beach Raceway than the Pompano Beach condominium.) Petitioner would arrive at the racetrack at 7 a.m. and work there until noontime when he returned home. Four nights a week, petitioner would return to the racetrack to solicit sales of his horses and watch the races. During 1984, petitioner used the Lighthouse Point house as his personal residence in Florida during racing season. His wife and daughter *413 spent a total of 20 days at the Lighthouse Point house during 1984. His son, Edward III, resided in the Lighthouse Point house during January and February 1984. Petitioners claimed depreciation deductions for their Lighthouse Point home, and furnishings therein, on Schedule C of their 1984 tax return, based on a 50 percent business usage. On their 1984 amended return, they claimed 100 percent business usage. Petitioners expended the following amounts during 1984 with respect to their Lighthouse Point home (which they characterized as "lodging" expenses): Real Estate Taxes
$ 3,323.94
Mortgage Interest
15,966.29
Florida Power & Light
752.20
Broward Utilities
61.62
Traveler House Insurance
1,005.00
National Flood Insurance
248.00
Lawn Maintenance
480.00
Pest Control
336.00
Disposal Fees
47.30
Water Division Fees
621.58
TOTAL
$ 22,841.93
On their 1984 return, petitioners deducted $ 10,278.87 of said expenses as employee business expenses in connection with East Coast Pools. They deducted an additional $ 1,142.09 of said expenses on Schedule C as expenses in connection with petitioner's horse racing activities. Petitioners *414 deducted on Schedule A of their 1984 return $ 1,661.97 for real estate taxes and $ 7,983.14 for mortgage interest with respect to their Lighthouse Point home. [3]
Finally, petitioners deducted as an employee business expense $ 3,975.75 ($ 28.40/day X 140 days) for meals while petitioner was in Florida. Petitioner did now know how he arrived at this figure. He had no records or documents to substantiate the claimed expenses. Respondent disallowed the "lodging" deduction claimed for petitioners' Lighthouse Point home as well as petitioner's meals while in Florida; respondent also disallowed the reported $ 9,576.06 Pompano Beach rental loss. He allowed a part of the deduction claimed for petitioners' Lynnfield home office; the allowed deduction was based on the percentage of square footage of the office (120 sq. feet) to the square footage of livable space in the house (2,400 *415 sq. feet) . Thus, respondent allowed 5 percent, rather than 12.5 percent, of the maintenance expenses. At trial, the Court granted respondent's motion to amend his pleadings to conform to the evidence for the purpose of disallowing $ 13,262 of the depreciation and maintenance expenses which petitioners claimed for their Lighthouse Point home; the Court also granted respondent's motion to allow petitioners an additional $ 13,577.00 deduction for interest and taxes with respect to their Lighthouse Point home. OPINION The first issue for decision is whether respondent erred in disallowing expenses claimed by petitioner for meals and lodging expenses while in Florida. Petitioners bear the burden of proving respondent erred. Section 162(a)(2)[4] allows a taxpayer to deduct his "ordinary and necessary" expenses for travel "while away from home in the pursuit of a trade or business." Commissioner v. Flowers, 326 U.S. 465, 470 (1946); Bochner v. Commissioner, 67 T.C. 824, 827 (1977). Personal, living, or family expenses, however, are generally not deductible. *416 Section 262.
The purpose of the section 162(a)(2) deduction is to mitigate the burden upon a taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional living expenses. Tucker v. Commissioner, 55 T.C. 783, 786 (1971); Kroll v. Commissioner, 49 T.C. 557, 562 (1968). Respondent claims that during the racing season Florida was petitioner's tax home; thus, he argues petitioner's Florida-related expenses, which petitioner characterizes as meals and lodging expenses, are personal, nondeductible living expenses. Respondent further argues that petitioner cannot deduct his Florida meals because he did not substantiate such expenses by adequate records or other sufficient evidence as required under section 274 and its accompanying regulations. Petitioner asserts that all the expenses are deductible under section *417 162(a)(2), claiming his tax home was Massachusetts and not Florida. Generally, a taxpayer's home for purposes of section 162(a) is the area or vicinity of his principal place of employment. Commissioner v. Stidger, 386 U.S. 287 (1967); Daly v. Commissioner, 72 T.C. 190, 195 (1979), affd. 662 F.2d 253 (4th Cir. 1981). However, a taxpayer can have more than one tax home in a given year. See Regan v. Commissioner, T.C. Memo. 1987-512, citing Montgomery v. Commissioner, 64 T.C. 175, 179 (1975), affd. 532 F.2d 1088 (6th Cir. 1976). During 1984, petitioner spent approximately the same amount of time in Florida as he did in Massachusetts. He had three Florida-based business activities: (1) managing and training horses for Andrews Farms, (2) managing and training horses for Pilgrim Farms, and (3) providing consultation services to East Coast Pools by Andrews. Petitioner's principal business in Florida, horse racing and breeding, was not a temporary activity of short duration, but rather it *418 was a recurring seasonal activity, which began in 1972 and continued through the year in issue (between January and mid-April, and November and December of each year). See Dilley v. Commissioner, 58 T.C. 276, 280 (1972). We therefore conclude that petitioner had two tax homes in 1984, one in Florida from January through April and during November and December (primarily working with the horse racing and breeding business) and another in Massachusetts between May and October (primarily working with the pool construction business). Since petitioner was not "away from home" when he incurred the meals and "lodging" expenses in Florida, we sustain respondent's disallowance of these deductions. (We wish to note that even had we concluded otherwise, i.e., that petitioner was away from home during his six months in Florida, we would sustain respondent's disallowance of petitioner's meals deduction on the grounds that petitioner did not meet the substantiation requirements of section 274(d).) Further, section 280A would disallow a deduction for the Lighthouse Point home expenses, which petitioner characterized as "lodging" expenses, except for interest and taxes which *419 respondent has allowed. (Insofar as petitioner's Lighthouse Point home expenses, which he labelled "lodging" expenses, are concerned, we are not persuaded that such expenditures tax-wise are "lodging" expenses. Generally, "lodging" expenses connote expenditures made for payment of hotel rooms or apartment rentals. Cf. Hynes v. Commissioner, 74 T.C. 1266, 1292 (1980), and Hantzis v. Commissioner, T.C. Memo. 1979-299, revd. 638 F.2d 248 (1st Cir. 1981). The second issue for decision is whether respondent erred in disallowing depreciation expenses claimed by petitioners for their Lighthouse Point home. We conclude respondent did not err in so doing. Petitioners' rationale for claiming the depreciation expenses is unclear. Assuming the Lighthouse Point property is a business asset, a depreciation deduction would normally be permitted under section 167. However, the record is devoid of any evidence to support a finding that petitioners' Lighthouse Point house was a business asset. Moreover, section 280A(a) would prohibit any deduction for expenses paid with respect to a dwelling unit used by the taxpayer as his residence (except *420 for interest, taxes, etc.). The third issue for decision is whether respondent erred in disallowing the claimed $ 9,576.06 Pompano Beach rental loss. Respondent disallowed the deduction for such loss on the grounds that petitioner's rental activity constitutes an activity not engaged in for profit within the meaning of section 183. We disagree. The expenses and depreciation relating to renting the condominium unit are deductible if the property is either used by petitioner in a trade or business or held for the production of income. Sections 162 and 212. These sections require that the trade or business or income producing activity be engaged in for profit. Petitioners realized a loss from their Pompano Beach condominium in 1984. However, nonprofitability from an activity is simply evidence to be considered in determining the existence of the alleged trade or business. Wiles v. United States, 312 F.2d 574 (10th Cir. 1962). Petitioners' lack of rental income is explained by the fact that the condominium association rules prohibited short-term rentals. Further, *421 in 1984, the rental market in South Florida was saturated. The loss sustained by petitioners in 1984 is outweighed by their eventual success in realizing a substantial profit from the sale of the unit in 1986. Petitioners incurred expenses in managing, conserving and maintaining the condominium during 1984. We believe they made an honest and reasonable effort to rent the condominium and conclude that the Pompano Beach condominium was property held for the production of income during 1984. Accordingly, petitioners are entitled to the claimed $ 9,576.06 Pompano Beach rental loss. The final issue for decision is whether respondent erred in disallowing a portion of a deduction claimed by petitioners as a home office expense. We conclude respondent did not so err. Petitioners claimed a deduction on their 1984 return for 12.5 percent of the maintenance expenses of their Lynnfield home, based on the ratio of rooms in the home. Respondent contends that petitioners are only entitled to 5 percent of the expenses, based on a square footage ratio. Section 1.280A-2(i)(3), Prop. Income Tax Regs. *422 , provides: The taxpayer may determine the expenses allocable to the portion of the unit used for business purposes by any method that is reasonable under the circumstances. If the rooms in the dwelling unit are of approximately equal size, the taxpayer may ordinarily allocate the general expenses for the unit according to the number of rooms used for the business purpose. The taxpayer may also allocate general expenses according to the percentage of the total floor space in the unit that is used for the business purpose. * * *
(We note that these are but proposed regulations and may differ from any final version.) The rooms in petitioner's Lynnfield home were not equal or even approximately equal in size. In our opinion, the expenses should be allocated on a square footage basis. See Feldman v. Commissioner, 84 T.C. 1, 8 (1985), affd. 791 F.2d 781 (9th Cir. 1986). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Petitioners expended the following amounts during 1984 with respect to the Lynnfield house: ↩
Real Estate Taxes
$ 3,161.12
Mortgage Interest
2,010.02
Insurance
977.00
Electricity
1,101.29
Heating Fuel
1,463.90
Water
247.71
House & Ground Maintenance
341.00
TOTAL
$ 9,302.04
2. During 1984, petitioners expended the following amounts with respect to the Pompano Beach condominium: ↩
Cleaning & Maintenance
$ 2,100.00
Insurance
104.00
Mortgage Interest
2,900.00
Real Estate Taxes
1,678.24
Utilities
813.82
TOTAL
$ 7,596.06
3. These amounts represent 50 percent of the total real estate taxes and mortgage interest paid with respect to the Lighthouse Point home.↩
4. All section references are to the Internal Revenue Code of 1954, as amended and in effect for 1984.↩