BETSY LUSK YEOMANS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 60656, 61741. Filed June 30, 1958.

*James W. Allen, C. P. A.*, for the petitioner.
*Jack D. Yarbrough, Esq.*, for the respondent.

The respondent determined deficiencies in income tax against the petitioner as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 60656 | {1951 | $528. 51 |
| | {1952 | 727. 88 |
| 61741 | 1953 | 593. 80 |

The only question for determination is whether petitioner is entitled to deductions for the cost of various items of clothing and accessories worn by her in the course of her employment, and if so, the amount thereof. Some of the adjustments entering into respondent's determination of the deficiencies herein are not in issue.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found as stipulated.

Petitioner is a native and resident of Nashville, Tennessee. She filed her income tax returns for the years herein with the district director of internal revenue for Tennessee. The returns were filed by the calendar year and on a cash basis.

Petitioner became an employee of General Shoe Corporation, in Nashville, in 1947, and continued as an employee up through the taxable years. Prior to 1947, she had been a professional violinist, and at times or for a period or periods not specified had assisted her mother in the operation of a ladies' specialty store under the name of Town & Country Shop. This shop handled the higher-priced range of ladies' clothes.

General Shoe Corporation, hereafter referred to as General Shoe, manufactures several lines of women's shoes, which it sells in its own retail stores and distributes to chain stores and independent retail outlets. Some of the shoes manufactured during the years herein were Valentine, a line of women's dress shoes; Fortunette, a line of casual shoes, in which some if not all featured wedged heels; Teen-Age shoes; and a Sears, Roebuck and Company line, which consisted of dress shoes.

In 1948 petitioner became fashion coordinator for General Shoe, which position she held during the taxable years involved. A part

of her work was performed in conjunction with the style department of the company. She would obtain advanced style information from various sources and make recommendations as to color and basic outlines for shoe and heel treatment, so as to conform the finished product to the proper style. On occasion, she would purchase shoes made by other manufacturers for use by the General Shoe stylists. They would at times copy the style and design of such shoes. She assisted the sales department in promoting the acceptance and sale of the women's shoes produced by General Shoe by planning and staging style shows. In some instances, the shows would be private presentations to the shoe buyers and top executives of large retail establishments, such as Sears, Roebuck and Company. Other shows would be open to the public, and would usually be staged in, and in cooperation with, retail stores which stocked and sold the lines of shoes produced by General Shoe.· Also in the course of her duties, petitioner established and maintained contacts with the fashion editors of such magazines as Vogue, Charm, Mademoiselle, Harper's Bazaar, and Glamour.

The advertising director made the plans and arrangements for the style shows at which General Shoe presented its various lines of shoes. Petitioner worked closely with him and the executives of the sales division. He and petitioner reported to the same official, the sales coordinator of the company.

Petitioner was a member of Fashion Group of America, which membership aided her in obtaining advance style information covering hats, gloves, scarfs, outfits, shoes, and stockings. She visited the fabric houses, undertaking to keep informed as to new and prospective developments in fabrics. She also made studies of leather and the trends therein both as to types of leather and the color.

In the course of her employment petitioner frequently made trips to various parts of the United States. Some of these trips were for the purpose of staging style shows, while others were for the purpose of learning and keeping abreast of the style and fashion trends and developments. In each of the taxable years, she spent approximately 2 weeks in New York in both March and September. On those trips, she would on some occasions work in store presentations, but usually her time was spent in meetings with other fashion people and with leather people, at which time the discussions had to do with what was "fashion right," and what would be developed and disclosed as such. These New York trips she regarded as the most important trips made by her in the performance of her duties as fashion coordinator for General Shoe. Another trip which served to keep her abreast of the fashion trends in shoes was made in October of each year to attend the Chicago Shoe Fair. At this fair each shoe manufacturer would exhibit a pair of shoes for the following spring or summer. Fashion

editors and buyers from all over the country would be in attendance. The stay in Chicago would be 4 or 5 days, and the activities would be continuous from breakfast through the evening. Another gathering place for shoe stylists, fashion people, and buyers was at a meeting held twice a year in St. Louis by one of the leather houses, which dealt in high-fashioned leather and from which General Shoe bought a considerable amount of leather. Petitioner usually attended these meetings.

It was customary for the fashion people in attendance at meetings such as those described to dress according to the most advanced styles, and to do credit to General Shoe as its fashion coordinator, petitioner deemed it essential that she be dressed in keeping with the styles worn by those in attendance. A fashion coordinator is a representative of the fashion world, and buyers, merchandise managers, and store executives expect her, by dress and appearance, to reflect a knowledge of the very advanced and coming fashions. To have dressed differently, petitioner felt, would have indicated that she "did not know what it was all about," and would have reflected unfavorably upon General Shoe. Also, she was "trying to get ahead."

From day to day, and for personal as distinguished from business wear, petitioner preferred a plainer and more conservative style of dress. As a consequence, some of the items of clothing and accessories which she bought and wore at meetings such as those described and at some of the style shows which she staged and directed, were acquired for business purposes only and were never worn by her for personal or individual uses.

In staging the style shows for General Shoe, petitioner did not do the modeling of the shoes shown. She would direct the show, and by microphone would comment on the shoes as they were being displayed by models employed for that purpose. She did usually wear shoes of the type that was being promoted, and dressed in what she considered a proper style of clothing to go with the shoes. She did not make changes of shoes or other clothing in the course of the show, but would wear the same outfit throughout.

In January of 1951, petitioner staged a style show in Portland, Oregon, for the purpose of demonstrating a line of casual shoes to executives of the Jantzen Company, a manufacturer of bathing suits, sweaters, skirts, and other sports clothes. For the purpose of showing the shoes in a manner she regarded as fitting and proper, petitioner had a sport skirt made to wear with the shoes that Jantzen Company wanted demonstrated. The color, style, and weight of the skirt were such that she never wore the skirt for her own personal use.

From Portland, petitioner went to Los Angeles, California, to attend a shoe convention, and while there appeared on a television show.

For that appearance, she wore a dress sent to her by her mother for that particular occasion. The dress was of sheer material and had a full, pleated skirt, and seated as she was during the television appearance, petitioner thought that the impression it made was very good. In type and style, however, the dress was not suitable to petitioner for general wear, and she did not wear it again.

In March of 1951, petitioner went to Tulsa, Oklahoma, for the purpose of putting on a show for teen-agers. To dress the part for the show she found it quite difficult, but she did have some special clothes made for the occasion, which she never thereafter wore.

In July of 1952, petitioner was in Billings, Montana, for a period of 4 days, during which she served on a fashion clinic board for teen-agers. The weather was hot, and there, as in Tulsa the year before, she wore clothing which she thought would appeal to teen-agers. This clothing was not suitable for and could not be worn for her personal uses.

In April of 1951, petitioner bought a white and navy middy dress from the Town & Country Shop, for use in a style show she was staging. At or about that time, some effort was being made to revive that style of garment. Petitioner bought and used the outfit solely for show purposes. At no time did she wear, or intend to wear, the middy dress for personal uses and purposes. The effort to revive the style was unsuccessful, at least during the taxable years and some years thereafter.

During the years 1951, 1952, and 1953, and in the course of her employment as fashion coordinator for General Shoe, petitioner made trips as follows:

### 1951

| Month | Trip to | Duration |
|-------|---------|----------|
| January | New York | 5 days |
| | Portland, Oregon | 4 days |
| | Los Angeles, California | 1 week |
| February | St. Louis, Missouri | 3 days |
| | Hartford, Connecticut | 3 days |
| | Boston, Massachusetts | 4 days |
| March | New York | 2 weeks |
| | Tulsa, Oklahoma | 3 days |
| | Houston, Texas | 4 days |
| April | Atlanta, Georgia | 2 days |
| | Wilmington, N. C | 2 days |
| July | St. Louis, Missouri | 3 days |
| | New York | 1 week |
| September | New York | 2 weeks |
| | Jacksonville, Florida | 3 days |
| | Milwaukee, Wisconsin | 2 days |
| October | Chicago, Illinois | 4 days |
| November | Columbia, S. C | 3 days |

### 1952

| Month | Trip to | Duration |
|---|---|---|
| February | St. Louis, Missouri | 4 days |
| March | New York | 2 weeks |
| May | Louisville, Kentucky | 1 day |
| June | New York | 4 days |
| July | Billings, Montana | 4 days |
| | San Francisco, California | 1 week |
| | Los Angeles, California | 1 week |
| September | Minneapolis, Minnesota | 4 days |
| | New York | 15 days |
| October | Chicago | 4 days |

### 1953

| Month | Trip to | Duration |
|---|---|---|
| February | St. Louis, Missouri | 4 days |
| March | New York | 2 weeks |
| April | New York / Hartford, Connecticut | 1 week |
| May | Dallas, Texas / Houston, Texas / San Antonio, Texas | 2 weeks |
| July | New York | 1 week |
| September | New York | 2 weeks |
| October | Chicago | ——— |
| November | Chicago | ——— |

Throughout the years of petitioner's employment with General Shoe her employment was under an oral agreement, which covered the amount of salary, when a salary raise might be expected, and the insurance and stock benefits she would derive from her employment. General Shoe paid her expenses for transportation, food, and lodging incurred on the trips made by her in the performance of the duties of her employment. It did not pay for or give her an allowance for special clothing.

Soon after she became fashion coordinator, petitioner concluded that her expenditures for clothing to be worn by her in the performance of her duties were such as to merit and justify an allowance therefor from General Shoe. She discussed the matter with the vice president in charge of all of the women's lines, and asked him for an allowance. The request was refused. She was told to pay for her clothes and "deduct that from [her] income tax." Thereafter, she complained yearly about her financial situation, requesting either a raise in salary or that she be given a clothing allowance. She was never reimbursed for any of the clothes bought and used by her in the performance of her duties as fashion coordinator, which performance of duties included the staging of the style shows in which she participated.

Petitioner was never told to buy any specific clothes for use in the performance of her duties. She always furnished, at her own expense, the clothes she wore, and used her own discretion as to the

purchases made. With respect to the shoes of other manufacturers purchased by her and submitted to the General Shoe stylists, she was reimbursed for her expenditures if the shoes so purchased were used. If the shoes were not used by the company, she was not reimbursed therefor.

The clothes and other items of apparel bought for a particular appearance or show were used by petitioner in subsequent shows and appearances whenever suitable. In 1951 and 1952 petitioner was able to sell a few such items of clothing and apparel when they were no longer useful. Other items were given to her church for sale at bazaars, or otherwise given away or discarded.

Petitioner expended the sum of $2,161.23 for her wardrobe during the year 1951. She received $42.75 from the sale of some of those items, leaving a net expenditure of $2,118.48. On her income tax return for 1951, she deducted $1,185 as the cost of wearing apparel and accessories which were bought for the special purpose of personal appearances. In his determination of the deficiency for 1951, the deduction so claimed was disallowed by the respondent. Set forth below are various of the articles of clothing and accessories purchased by petitioner at wholesale from the Town & Country Shop and articles purchased at retail from other stores, during 1951, which purchases were a part of the total expenditure of $2,161.23 above:

PURCHASED AT WHOLESALE FROM TOWN & COUNTRY SHOP

| Jan. 4, 1951 | Red wool skirt for special shade red shoe. | $21.00 |
|---|---|---|
| Jan. 16, 1951 | Coral felt taupe trimmed hat | 10.50 |
| Jan. 23, 1951 | Costume jewelry for same | 6.02 |
| Jan. 29, 1951 | Print scarf and blue scarf | 3.02 |
| | Express: California–New York | 7.05 |
| Feb. 16, 1951 | Navy tissue faille dress | 45.75 |
| Feb. 19, 1951 | Bracelet | 3.96 |
| | Gloves, white and navy | 4.36 |
| Feb. 27, 1951 | Gray sheer wool dress with bolero | 60.00 |
| Apr. 7, 1951 | Pink hat | 9.35 |
| Apr. 18, 1951 | White and navy middy dress | 14.75 |
| May 15, 1951 | Pink linen dress with duster | 36.25 |
| June 6, 1951 | Black shantung formal with jacket | 47.25 |
| Sept. 5, 1951 | Black velvet lace dress | 46.25 |
| Sept. 10, 1951 | Beige flannel suit | 42.75 |
| Sept. 11, 1951 | Dark gray crepe blouse | 6.75 |
| Oct. 8, 1951 | Yellow gloves | 1.96 |
| | Beige gloves | 5.50 |
| Oct. 16, 1951 | Mauve hat | 15.95 |
| Dec. 23, 1951 | Beige crepe blouse | 6.32 |
| Total | | $394.74 |

PURCHASES AT RETAIL

| | | |
|---|---|---:|
| January | Tinsley's—costume jewelry | $19. 38 |
| | Chayburke's—altering fur for special show. | 15. 00 |
| | Loveman's—hats | 78. 97 |
| March | Cain-Sloan—shoes | 26. 01 |
| | Bonwit Teller—shoes | 10. 10 |
| | J & J Slater—shoes | 23. 20 |
| | Saks—shoes | 64. 37 |
| May | Gus Mayer—hat | 8. 06 |
| | Rich-Schwartz—gloves | 5. 10 |
| June | Loveman's—T. V. makeup | 5. 20 |
| August | Saks—shoes | 33. 95 |
| September | Special fabric for suit | 6. 00 |
| October | Bonwit Teller—hat | 16. 43 |
| | Manss—shoes | 25. 45 |
| | Tinsley's—shoes | 20. 86 |
| | I. Miller—shoes | 28. 79 |
| | Lord & Taylor | 41. 57 |
| December | Dressmaker | 86. 00 |
| | Mrs. Martin Condon—shoes | 23. 66 |

| | |
|---|---:|
| Total | $593. 10 |
| Grand total | 987. 84 |

Petitioner expended the sum of $2,263.89 for her wardrobe during the year 1952. She received $15 from the sale of some of those items, leaving a net expenditure of $2,248.89. On her income tax return for 1952, she deducted $1,484.60 as the cost of wearing apparel and accessories which were bought for the special purpose of personal appearances. In his determination of the deficiency for 1952, the deduction so claimed was disallowed by the respondent. Set forth below are various of the articles of clothing and accessories purchased by petitioner at wholesale from the Town & Country Shop and articles purchased at retail from other stores, during 1952, which purchases were a part of the total expenditures of $2,263.89 above:

PURCHASED AT WHOLESALE FROM TOWN & COUNTRY SHOP

| | | |
|---|---|---:|
| Jan. 3, 1952 | Black taffeta petticoat | $3. 75 |
| Jan. 9, 1952 | Ecru blouse, brown rust trim | 5. 22 |
| Jan. 23, 1952 | Black linen dress, with cape | 31. 25 |
| Jan. 31, 1952 | Parcel post | 1. 97 |
| Feb. 14, 1952 | Black sheer dress, white linen cape | 36. 25 |
| | Navy wool bolero suit | 54. 25 |
| Feb. 27, 1952 | Red straw hat, red veil | 7. 50 |
| | White doeskin gloves | 4. 40 |
| Feb. 29, 1952 | Navy crepe bag | 6. 26 |
| Apr. 18, 1952 | White batiste blouse | 4. 75 |
| May 6, 1952 | White p. k. gloves | 2. 61 |
| May 8, 1952 | Charcoal two piece dress, white trim | 19. 00 |
| May 26, 1952 | Gold shantung sunback dress | 18. 75 |

| | | |
|---|---|---:|
| May 28, 1952 | White knit dress | $26. 75 |
| May 29, 1952 | Navy and white shantung dress | 29. 12 |
| | Red scarf | 2. 25 |
| Aug. 30, 1952 | Pigskin gloves | 4. 04 |
| | Red velvet hat | 3. 75 |
| Sept. 8, 1952 | Black velvet hat | 9. 50 |
| | Black jersey turban | 6. 00 |
| Sept. 9, 1952 | Beaver crepe dress, black velvet trim | 29. 50 |
| | Air Mail Special postage | 2. 52 |
| Sept. 30, 1952 | Mink brown jersey turban | 2. 75 |
| Oct. 24, 1952 | Black taffeta two piece dress | 55. 50 |
| | Black velvet blouse | 10. 50 |
| Nov. 2, 1952 | White lace blouse | 13. 75 |
| Nov. 5, 1952 | White satin scarf | 1. 33 |
| Total | | $393. 22 |

PURCHASES AT RETAIL

| | | |
|---|---|---:|
| | Green Hill Booterie—shoes | $13. 21 |
| January | J & J Slater—shoes | 17. 41 |
| | Mrs. Jack Green | 10. 50 |
| | Saks—shoes | 17. 46 |
| March | Famous Barr—shoes | 38. 18 |
| | Mrs. E. Christmas, dressmaking | 16. 00 |
| | Guy Mayer—hat | 20. 35 |
| April | Saks—shoes | 28. 37 |
| | Bonwit Teller—shoes | 44. 30 |
| | Mrs. E. Christmas, dressmaking | 70. 00 |
| June | Baynham's—shoes | 19. 33 |
| September | Martha West—dress | 29. 35 |
| | J & J Slater—shoes | 45. 90 |
| | Saks—shoes | 66. 71 |
| October | Lord & Taylor—shoes | 60. 48 |
| | Baynham's—shoes | 18. 31 |
| | Gus Mayer's—hat | 15. 20 |
| November | Chayburke's—special alteration, fur | 35. 00 |
| | Jay Thorpe—shoes | 17. 46 |
| Total | | 583. 52 |
| Grand total | | 976. 74 |

Petitioner expended the sum of $2,642.11 for her wardrobe during the year 1953. On her income tax return for 1953, she deducted $1,835.20 as the cost of wearing apparel and accessories which were bought for the special purpose of personal appearances. In his determination of the deficiency for 1953, the deduction so claimed was disallowed by the respondent. Set forth below are various of the articles of clothing and accessories purchased by petitioner at wholesale from the Town & Country Shop and articles purchased at retail from other

stores, during 1953, which purchases were a part of the total expenditures of $2,642.11 above:

### Purchased at Wholesale From Town & Country Shop

| | | |
|---|---|---:|
| Jan. 29, 1953 | Beige wool suit with stole | $53. 75 |
| Jan. 30, 1953 | Blue box jacket suit | 32. 25 |
| | Postage | 2. 81 |
| Feb. 11, 1953 | Black straw hat, patent trim | 6. 50 |
| | White straw hat, toast trim | 6. 50 |
| Feb. 12, 1953 | Costume jewelry | 8. 40 |
| Feb. 17, 1953 | Navy sheer dress, pink trim | 31. 25 |
| Feb. 19, 1953 | Green and white scarf | . 66 |
| | Parcel post—hat | 1. 76 |
| Mar. 3, 1953 | Express to New York | 2. 46 |
| Apr. 1, 1953 | Set white bracelets | 1. 25 |
| Apr. 30, 1953 | Postage | 3. 33 |
| May 4, 1953 | Black crepe pleated dress—jacket | 42. 50 |
| May 25, 1953 | White nylon petticoat | 3. 75 |
| Aug. 4, 1953 | Three tone turban | 9. 50 |
| | Oxford gray wool jersey suit | 33. 75 |
| Aug. 26, 1953 | Black crepe dress, white jeweled collar | 40. 75 |
| Aug. 31, 1953 | Black hat, red trim | 5. 50 |
| Sept. 2, 1953 | Multi-stripe turban | 12. 50 |
| Sept. 4, 1953 | Cocoa crepe blouse | 3. 75 |
| | Gray crepe, bead trim | 10. 75 |
| Oct. 20, 1953 | Blue velour hat | 4. 00 |
| | Blue blouse | 4. 75 |
| Nov. 6, 1953 | Costume jewelry | 2. 22 |
| Nov. 11, 1953 | Costume jewelry | 6. 00 |
| Nov. 12, 1953 | White doeskin gloves | 6. 05 |
| Total | | $336. 69 |

### Purchases at Retail

| | | |
|---|---|---:|
| January | Bonwit Teller | $33. 89 |
| | Cain-Sloan—hat | 34. 43 |
| March | Cain-Sloan—hats | 42. 90 |
| April | Bonwit Teller | 34. 46 |
| June | Saks | 13. 50 |
| | Guarantee Shoe Store | 28. 71 |
| | Neiman Marcus | 72. 80 |
| July | Ted Saval—shoes | 11. 58 |
| | Wolsom, Ltd.—shoes | 11. 90 |
| August | Manss—shoes | 17. 24 |
| | Special leather | 10. 10 |
| | Bonwit Teller—jewelry | 3. 00 |
| | Bonwit Teller—shoes | 20. 38 |
| September | Rich-Schwartz—hat | 19. 33 |
| October | Bonwit Teller—shoes | 20. 38 |
| | Guarantee Shoe Store | 13. 00 |
| | Bonwit Teller | 19. 52 |
| | Cain-Sloan—hats | 78. 59 |
| November | Shoes | 35. 82 |

PURCHASES AT RETAIL—Continued

December _____ {Loveman's _____ $15. 74
                    {Cain-Sloan _____ 27. 76

  Total _____ $565. 03

  Grand total _____ 901. 72

According to her income tax returns for the years 1951, 1952, and 1953, petitioner's income for the said years was as follows:

|  | 1951 | 1952 | 1953 |
|---|---|---|---|
| Salary—General Shoe Corporation | $3,548.75 | $4,333.75 | $4,467.50 |
| Dividends | 938.89 | 608.89 | 695.52 |
| Interest | 482.79 | 364.82 | 555.79 |
| Trust income | 3,258.80 | 5,728.15 | 5,742.62 |
| Losses | | | (362.36) |
| Total income | 8,229.23 | 11,035.61 | 11,099.07 |

For 1951 petitioner expended at least $375, and for 1952 and 1953, $300 for each year, in carrying out her duties and earning her salary as fashion coordinator for General Shoe.

OPINION.

TURNER, *Judge:* The question is whether or not certain expenditures by petitioner for clothing and other items of wearing apparel during the years herein were ordinary and necessary expenses made by her in earning her salary as fashion coordinator for General Shoe. It is the respondent's position that the expenditures were personal expenses, and not deductible.

The parties have stipulated that petitioner expended $2,161.23 for clothing and other items of wearing apparel in 1951; that she expended $2,263.89 for such items in 1952, and $2,642.11 in 1953. Of those amounts, and under miscellaneous expenses, petitioner deducted on her returns for such years, $1,185 for 1951, $1,484.60 for 1952, and $1,835.20 for 1953, which amounts were disallowed by the respondent in his determination of the deficiencies here involved. At the trial and on brief, petitioner has reduced the deductions claimed to $987.84 for 1951, $976.74 for 1952, and $901.72 for 1953.

That the cost of uniforms which are required or essential in an employment, and which are not suitable for general or personal wear and not so worn, is a deductible item in arriving at taxable net income, may be regarded as fairly well settled. *Helen Krusko Harsaghy*, 2 T. C. 484, appeal dismissed; *Eleanor E. Meier*, 2 T. C. 458, appeal dismissed; and *Marcus O. Benson*, 2 T. C. 12, affd. 146 F. 2d 191. In the instant case, the clothing in question may not properly be classified as uniforms, such as the nurse's uniforms worn by the

taxpayers in the *Meier* and *Harsaghy* cases, or the uniform of a high-way patrol officer, as in the *Benson* case. In substantial part, the clothing here was new and ultra in style and design, and was such as might be sought after and worn for personal use by women who make it a practice to dress according to the most advanced or extreme fashions. All items were purchased by petitioner according to her sole discretion and judgment, and their selection was not dictated or controlled in any way by her employer. These facts, however, are not, in our opinion, conclusive of the question before us.

We are satisfied from the evidence that as fashion coordinator for General Shoe and in the earning of her salary as such, it was essential that petitioner, in her appearances at the various meetings of the leaders in establishing shoe styles and fashions and of store executives and their buyers, as well as at most or all of the style shows staged for the showing of General Shoe's lines of products, should wear clothing of the most advanced styles and fashions, and that some of the items so worn were as described by her, items which were not suited for her private and personal wear, as distinguished from business wear, and that she did not so wear them. We are also satisfied from the evidence that the wearing of ultra or advanced fashions in clothes and of the special items for the style shows, such as the clothing worn at the show for teen-agers in Tulsa, were not made any the less essential and prerequisite to the proper performance by petitioner of her duties as fashion coordinator by the refusal of General Shoe to make her an allowance therefor, whatever the normal reaction to such a policy might be. In short, we are satisfied that in employing her as its fashion coordinator, General Shoe expected and anticipated that she would, on the occasions indicated, wear such items of clothing and would provide them at her own expense. We accordingly conclude and hold that in each of the years herein some portion of the expenditures made by petitioner for her wardrobe constituted ordinary and necessary expense in the performance of her duties as fashion coordinator for General Shoe and in the earning of her salary as such, and are proper deductions in computing her net income for such years. See and compare *Wilson John Fisher*, 23 T. C. 218, 225.

The difficulty is with respect to the amounts so expended. Petitioner, in the course of her testimony, singled out a few specific items, which we are satisfied were suitable for and used only in her work. With respect to most items, however, her testimony was only general, and in many instances consisted merely of stated conclusions that the garments were of such character that they were not suitable for her personal and private use, and were not so used. At other points in her testimony, the basis for the conclusion seemed to be not so much the unsuitability of the various items for her personal and private wear, or that she did not so wear them, but rather, that differences

in the climates of the places from which and to which she moved within comparatively short periods of time resulted in the purchase of more clothing and more varied clothing than she otherwise would have acquired. The extent to which these factors resulted in the purchase of clothing not suitable for personal wear and the discard thereof, without having been used for personal and private wear, the evidence does not show with any definiteness or certainty.

The facts show that in 1951 petitioner made 18 trips to various cities of the United States in the performance of her duties, two of which were to St. Louis, one to the Chicago Shoe Fair, and two were the March and September trips of 2 weeks each to New York, while the remainder presumably were for the staging of style shows. In 1952 she made 10 such trips, which included the March and September trips to New York, the October trip to Chicago, and 1 trip to St. Louis in February. In 1953 she made 11 trips, which included the March and September trips to New York, a February trip to St. Louis, and the October trip to Chicago. Since it was her testimony that she did not wear the clothing here in issue while performing her duties at the home office in Nashville, such variances in the number of trips might well suggest a conclusion that her expenditures for wearing apparel not privately or personally used were ratably less in 1952 and 1953 than in 1951. On the other hand, the actual number of days away from Nashville in the course of her employment shows a lesser variance. Her 18 trips in 1951 required 77 days, whereas the 10 trips in 1952 required 64 days and the 11 trips in 1953 required 60 days without accounting for the time spent on 2 Chicago trips. It may well be, also, that in 1951 she was able to use more items in more than one show than was true in 1952 and 1953. Applying the rule in *Cohan* v. *Commissioner*, 39 F. 2d 540, and bearing heavily against the petitioner, who had the burden of showing the permissible expenditures, we have concluded and found that for 1951 petitioner expended at least $375, and for 1952 and 1953, $300 for each year, in carrying out her duties and earning her salary as fashion coordinator for General Shoe, and to that extent the deductions claimed are allowed.

*Decision will be entered under Rule 50.*