T.C. Summary Opinion 2017-10

UNITED STATES TAX COURT

LARRY LEE LOCK, II, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

LARRY LEE LOCK, II AND KRISTI LEIGH LOCK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 23762-14S, 24629-14S.  Filed March 6, 2017.

Larry Lee Lock II and Kristi Leigh Lock, pro sese.

<u>Anne M. Craig</u>, <u>Lauren B. Epstein</u>, and <u>Caroline R. Krivacka</u>, for respondent.

SUMMARY OPINION

GUY, <u>Special Trial Judge</u>:  These consolidated cases were heard pursuant to the provisions of section 7463 in effect when the petitions were filed.[1]  Pursuant to

---

[1]These cases were consolidated for purposes of trial, briefing, and opinion.
(continued...)

section 7463(b), the decisions to be entered are not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent issued a joint notice of deficiency to Larry Lee Lock II and Kristi Leigh Lock determining income tax deficiencies of $19,439 and $22,643 for the taxable years 2010 and 2011, respectively. Respondent issued a separate notice of deficiency to Mr. Lock determining an income tax deficiency of $28,169 for the taxable year 2012. Petitioners invoked the Court's jurisdiction by filing timely petitions for redetermination with the Court. At the time the petitions were filed, petitioners resided in Florida.

After the petition was filed in the case at docket No. 24629-14S, Ms. Lock submitted to respondent a Form 8857, Request for Innocent Spouse Relief, for the taxable years 2010 and 2011. Respondent reviewed Ms. Lock's claim and determined that she is entitled to spousal relief for the taxable years 2010 and 2011 under the provisions of section 6015(c). Mr. Lock maintains that Ms. Lock is not entitled to relief.

---

[1](...continued)
Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the taxable years 2010, 2011, and 2012, and all Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts are rounded to the nearest dollar.

The issues for decision are whether: (1) Mr. Lock is a "qualified individual" who is entitled to exclude a portion of the wages that he earned overseas during the taxable years 2010, 2011, and 2012 (years in issue) under the foreign earned income exclusion provisions of section 911(a); (2) Mr. Lock is entitled to deductions for unreimbursed employee business expenses claimed on Schedules A, Itemized Deductions, for the years in issue;[2] and (3) Ms. Lock qualifies for spousal relief under section 6015(c) for the taxable years 2010 and 2011.[3]

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the accompanying exhibits are incorporated herein by this reference.

## I. Petitioners

Petitioners married in August 2002, and they have a son born in 2003. They divorced in October 2012.

---

[2]Respondent concedes that petitioners are entitled to deductions of $200, $230, and $440 for tax return preparation expenses for the taxable years 2010, 2011, and 2012, respectively, subject to the limitation prescribed in sec. 67(a).

[3]Other adjustments are computational and depend solely on the Court's disposition of the issues for decision.

Mr. Lock earned a bachelor's degree from Western Kentucky University in 1995. As discussed in detail below, Mr. Lock spent a number of years working as a law enforcement officer, followed by an extended period of employment working overseas as a personal security specialist for Triple Canopy, Inc. (TCI).

Ms. Lock completed high school, and since 2005 she has been employed as a clerical assistant. She was the primary caregiver for the couple's son while Mr. Lock worked overseas.

II. Mr. Lock's Employment Background

A. Deputy Sheriff

From 1995 until 2005 Mr. Lock was employed as a deputy sheriff in Florida, including service as a sniper on the special weapons and tactics team. From 2008 through at least July 2011 he continued to qualify as a reserve deputy sheriff, and he served in that capacity on occasion when he was not working for TCI.

B. Personal Security Services

TCI is a private security company and Government contractor with headquarters in Virginia. In late December 2005 TCI hired Mr. Lock as a personal security specialist to provide protection for U.S. Department of State (State Department) personnel and other high-ranking U.S. Government officials

primarily in Baghdad, Iraq, and other locations within that country. In August 2009 TCI promoted Mr. Lock to unit support coordinator--a supervisory position.

During most of 2010 and 2011 and for six months in 2012 Mr. Lock lived and worked primarily in the International Zone (IZ) (formerly known as the Green Zone) and neighboring areas in Baghdad. The IZ was a large area in central Baghdad, with secured points of entry, that housed the U.S. Embassy and civilian and military personnel. The IZ was controlled by the Iraqi military and police, and Mr. Lock reported that the area was frequently the target of mortar and rocket attacks.

### 1. TCI Employment Terms and Conditions

Among other conditions of his employment, TCI required Mr. Lock to maintain a valid U.S. tourist passport, a valid U.S. driver's license, and a bank account to facilitate electronic deposits of his paychecks. The Iraqi Ministry of Interior issued a series of entry and exit visas to Mr. Lock that allowed him to travel to and from Iraq for periods that normally lasted no more than 12 months. Mr. Lock's wife and son were not permitted to accompany him to Iraq.

### 2. Weapons and Equipment

Mr. Lock was not permitted to bring weapons into or out of Iraq. The U.S. Government provided Mr. Lock with all of the firearms that he used in Iraq,

including handguns, shotguns, and rifles. Mr. Lock was required to maintain proficiency in the use of those weapons, and he had access to a shooting range near his living quarters in the IZ for that purpose.

Mr. Lock purchased his own gun holsters and body armor for use in Iraq. In 2010 he purchased a laptop, a digital camera, and a portable GPS device, and in 2011 he purchased a tactical watch--items that he purportedly needed to properly perform advance site surveys and related missions for TCI. Mr. Lock acknowledged that he also used some of the tactical equipment in new businesses (described below) that he organized in the United States in 2011 and 2012.

In 2011 and 2012 Mr. Lock purchased several firearms which he stored at his home in Florida. In August 2011 he purchased a rifle that was identical to one that he used in Iraq. In April 2012 he purchased a Kimber handgun imprinted with the State Department "High Threat Protection Service" logo, and in December 2012 he purchased two Sig Sauer tactical handguns.

### 3. Principal Place of Business

Other than a temporary assignment in Israel in 2010, Mr. Lock's principal place of business in 2010, 2011, and most of 2012 was Iraq.

In 2010 Mr. Lock worked for TCI in Israel for 111 days and in Iraq for 163 days. In 2011 and 2012 Mr. Lock worked for TCI in Iraq for 278 and 178 days,

respectively. Mr. Lock was outside the United States for 334 days during the 12-month period beginning June 27, 2011, and ending June 26, 2012.

4. <u>Transportation, Support Services, and Living Quarters</u>

During the years in issue Mr. Lock traveled between Florida and Iraq via commercial airlines. TCI reimbursed Mr. Lock for his transportation expenses to and from Iraq.

The State Department issued letters of authorization to Mr. Lock dated December 3, 2009, and June 22, 2010, indicating that while he was performing contract services in Israel and Iraq he was entitled to Government-furnished services including mail delivery, meals, primary care, transportation, authorized weapons, and military banking. TCI provided Mr. Lock with a per diem allowance that covered his expenses for meals and housing while he was working in Israel in 2010.

TCI provided Mr. Lock with modest living quarters in the IZ. Specifically, Mr. Lock lived in a shipping container that had been modified to create two 15-by 15-foot rooms or apartments separated by a single entrance and a shared bathroom. Mr. Lock's room included a small refrigerator, a microwave oven, a television, a small desk, and a bed. TCI did not charge Mr. Lock for rent or for utilities. Mr.

Lock prepared some of his meals in his microwave oven, or he dined in restaurants in the U.S. Embassy or nearby in the IZ.

Mr. Lock enjoyed a support system in Iraq with his "brothers in arms". He primarily associated with fellow Americans working for TCI, but he also befriended others including U.S. Embassy personnel and some Iraqi police and military officers who served as interpreters and assisted TCI personnel as they passed through Iraqi security checkpoints. Mr. Lock spoke little Arabic, but he had picked up enough of the language over the years to "get out of a few situations."

### 5. Communications and Missions

Mr. Lock paid for Internet service, including voice over Internet phone service, in his living quarters in Iraq. He also purchased a cellular phone and paid for cellular phone service in Iraq, communications services that he used for both personal and business purposes.

Mr. Lock received preliminary notifications about TCI missions or work assignments via email on his personal computer. To obtain a "mission packet" which would provide details about the assignment, however, he was required to proceed to the U.S. Embassy and log in to a secure email system. Depending on the complexity of the operation, TCI missions lasted from 1 to 18 hours, and a

mission involving a congressional delegation might require security services for two or three days.

As a supervisor, Mr. Lock performed his duties from an office/command center, or, in the event of a high-priority mission, he would serve as a team leader in the field. He normally worked six days per week, with Fridays off.

Depending on his particular assignment, Mr. Lock was required to wear a blazer, a dress shirt and pants, and a tie, or khaki pants and a polo shirt. He was not required to wear a uniform or clothing bearing TCI's logo.

6. Banking

TCI electronically deposited Mr. Lock's paycheck into a joint checking account that he maintained with Ms. Lock at a bank in Florida. TCI routinely withheld Federal income tax and employment taxes from his salary. Mr. Lock was not subject to any Iraqi tax, duty, or fee.

While in Iraq Mr. Lock conducted banking transactions online, used a credit card, and obtained cash (in U.S. dollars) by cashing a check or using an automated teller machine inside the U.S. Embassy. Mr. Lock explained that most of the shops and businesses in the IZ preferred to transact business in U.S. dollars.

7. <u>Vacation Time</u>

Mr. Lock felt the stress that came with working in Iraq, and he looked forward to trips to the United States for rest and vacation. He scheduled his vacation time about four or five months in advance and would take as much leave as TCI would allow--usually 3 to 5 weeks of leave at a time or a total of about 10 weeks yearly.

8. <u>Knee Injury</u>

Mr. Lock suffered a knee injury while working in Iraq, and he returned to the United States for surgery on June 27, 2012. Although he was originally scheduled to return to Iraq after the surgery, his surgeon ultimately recommended restrictions on his activities that precluded his returning to work for TCI. Consequently, Mr. Lock did not return to Iraq, and his employment with TCI ended in October 2012.

9. <u>Unreimbursed Employee Expenses</u>

Mr. Lock maintains that he incurred a number of employee business expenses during the years in issue, that TCI did not have a written employee reimbursement policy, and that TCI did not reimburse him for any of the expenses in question.

At trial Mr. Lock presented schedules and bank records in an effort to substantiate employee business expenses reported on the Schedules A accompanying his tax returns for the years in issue. The schedules and bank records also related to additional expenses that he had failed to disclose to respondent's counsel before trial. Under the circumstances, the Court admitted the documents into evidence only insofar as they pertain to the expenses listed on the Schedules A.

III. Mr. Lock's Ties to the United States

A. Familial

While Mr. Lock was overseas, Ms. Lock and his son continued to reside in the couple's marital home Florida. Petitioners claimed Florida homestead exemptions on this residence for the years in issue.

Mr. Lock spent most of his TCI vacation time with his family and friends in Florida, and he made an annual trip to Kentucky to spend time with his mother, grandmother, and siblings.

B. Personal

Throughout the years in issue Mr. Lock was registered to vote in Florida, and he maintained a Florida driver's license. He also owned two trucks, a boat

and a trailer, and multiple firearms (described above) that he stored at his residence in Florida.

C. Economic

1. Real Property

In 2003 petitioners joined Mr. Lock's father in purchasing a residence in Florida. The following year, Mr. Lock's father transferred his interest in the property to petitioners by quitclaim deed. Although petitioners initially resided at this property, they subsequently converted it to a rental property and hired a realty company to manage it. Petitioners continued to own this property throughout the years in issue.

In 2004 Mr. Lock and a friend, Duane Johnson, organized Signal-15 Properties, LLC (Signal-15), as a Florida limited liability company and acquired a rental property in Florida. During the years in issue Mr. Lock owned this property and filed annual reports for Signal-15 with the State of Florida identifying himself as the firm's registered agent and a managing member.

In 2005 Mr. Lock and Mr. Johnson acquired another rental property in Florida by way of a warranty deed. Mr. Lock jointly owned this property throughout the years in issue.

Mr. Lock devoted about 200 hours during each of the years in issue to managing his rental properties in Florida.

### 2. Startup Businesses

In 2011 Mr. Lock and a partner, Chris Gately, organized three Florida limited liability companies, Off the X, OTX Solutions, and Off the X Fitness, intending to operate a firearms training business and to acquire and operate a franchise specializing in physical fitness training known as Workout Anytime. Mr. Lock maintained several bank accounts for these companies in Florida. In 2012 Mr. Lock filed annual reports with the State of Florida for the companies listed above, identifying himself as the registered agent and as a managing member of each firm.

## IV. Petitioners' Relationship

### A. Household Finances

During 2010, 2011, and early 2012 petitioners maintained at least three joint bank accounts in Florida. Mr. Lock's paychecks from TCI were deposited in one of these joint accounts (Mr. Lock's account), and he used the funds in this account to pay most of the family's household bills, including the mortgage on petitioners' residence. Ms. Lock's paychecks were deposited in a second account (Ms. Lock's account) which she used for day-to-day personal and miscellaneous household

expenses. Petitioners also maintained a money market account that Mr. Lock controlled.

### B. Dissolution of Marriage

Ms. Lock moved out of the marital home sometime in mid to late 2012. In October 2012 petitioners' marriage was dissolved.

## V. Tax Returns

Petitioners' tax returns for the years in issue were prepared by an accountant, Jerry F. Sowell, Jr. Ms. Lock had collected the couple's tax records for 2010 and 2011 and forwarded them to Mr. Sowell. When those tax returns were complete, Ms. Lock (with Mr. Lock's consent) signed them and filed them with the Internal Revenue Service.

### A. 2010

Petitioners filed a joint Federal income tax return for 2010, reporting wages of $142,020 on line 7 (comprising $117,963 earned by Mr. Lock and $24,057 earned by Ms. Lock). Petitioners attached a Form 2555, Foreign Earned Income, to the tax return, claimed that Mr. Lock was eligible for a foreign earned income exclusion of $91,500, and subtracted that amount from total income on line 21. Petitioners also attached a Schedule A to the tax return and claimed in relevant part a deduction of $1,969 (after the application of the 2% limitation prescribed in

section 67(a)) attributable primarily to Mr. Lock's unreimbursed employee business expenses of $2,279. The latter expenses comprised $205 for postage, $210 for supplies, $1,391 for uniforms, $180 for union and professional dues, $160 for a GPS system, and $133 to take the Graduate Record Examination (GRE).

Petitioners claimed a refund on an overpayment of $23,270 (the full amount of Federal income tax withheld from their wages), and that amount was deposited to Mr. Lock's account by electronic transfer on April 27, 2011. Over the next few weeks Mr. Lock transferred about $17,000 from his account to the money market account and another account that is not clearly identified in the record.

B. 2011

Petitioners filed a joint Federal income tax return for 2011, reporting wages of $186,129 on line 7 (comprising $162,195 earned by Mr. Lock and $23,934 earned by Ms. Lock). Petitioners attached a Form 2555 to the tax return, claimed that Mr. Lock was eligible for a foreign earned income exclusion of $92,900, and subtracted that amount from total income on line 21. Petitioners also attached a Schedule A to their tax return and claimed in relevant part a deduction of $1,611 (after the application of the 2% limitation prescribed in section 67(a)) attributable primarily to Mr. Lock's unreimbursed employee business expenses of $2,746,

comprising $1,524 for weapons, $180 for union and professional dues, $248 for uniforms, $300 for supplies, and $494 for electronics.

Petitioners claimed a refund on an overpayment of $25,896, and that amount was deposited to Mr. Lock's account by electronic transfer on April 18, 2012. That same day Mr. Lock transferred $25,000 to the money market account.

C. 2012

Mr. Lock filed a Federal income tax return for 2012, reporting wages of $156,891 on line 7. He attached a Form 2555 to his tax return claiming a foreign earned income exclusion of $95,100, and that amount was subtracted from total income on line 21. He also attached a Schedule A to his tax return and claimed in relevant part a deduction of $3,832 (after the application of the 2% limitation prescribed in section 67(a)) attributable primarily to his unreimbursed employee business expenses of $4,100 (comprising $3,566 for weapons, $180 for union and professional dues, $300 for uniforms, and $54 for supplies) and to "other" expenses of $270. Mr. Lock claimed a refund on an overpayment of $31,102.

## Discussion

### I. Foreign Earned Income Exclusion

Unless a specific income exclusion applies, a taxpayer is required to include in gross income all income from whatever sources derived. See sec. 61(a); Arnett

v. Commissioner, 126 T.C. 89, 91 (2006), aff'd, 473 F.3d 790 (7th Cir. 2007).[4]

Exclusions from income are construed narrowly, and taxpayers must bring themselves within the clear scope of the exclusion. Arnett v. Commissioner, 126 T.C. at 91-92. Because resolution of this issue turns on the application of a legal principle to mostly undisputed facts, the assignment of the burden of proof as to this issue is immaterial.

Section 911(a) provides in relevant part that a qualified individual may elect to exclude from gross income his foreign earned income for any taxable year. The term "foreign earned income" is defined generally in section 911(b)(1)(A) as the amount received by an individual from sources within a foreign country which constitutes earned income attributable to services performed by the individual during the period described in section 911(d)(1)(A) or (B), whichever is applicable.[5]

---

[4]Although most countries employ territorial tax systems, the United States employs a worldwide tax system--it taxes its citizens on their income regardless of its geographic source. See Crow v. Commissioner, 85 T.C. 376, 380 (1985).

[5]The amount of foreign earned income that may be excluded from gross income is subject to an annual adjustment for inflation and totaled $91,500 for 2010, $92,900 for 2011, and $95,100 for 2012. See Rev. Proc. 2009-50, sec. 3.28, 2009-45 I.R.B. 617, 624; Rev. Proc. 2010-40, sec. 3.19, 2010-46 I.R.B. 663, 666; Rev. Proc. 2011-52, sec. 3.28, 2011-45 I.R.B. 701, 707.

Section 911(d)(1)(A) and (B) defines a "qualified individual" as an individual whose tax home is in a foreign country and who is (A) a citizen of the United States and establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year (bona fide residence test) or (B) a citizen or resident of the United States and who, during any period of 12 consecutive months, is present in a foreign country or countries during at least 330 full days in such period (physical presence test).

Section 911(d)(3) defines the term "tax home" as follows:

> (3) Tax home.--The term "tax home" means, with respect to any individual, such individual's home for purposes of section 162(a)(2) (relating to traveling expenses while away from home).  An individual shall not be treated as having a tax home in a foreign country for any period for which his abode is within the United States.

In sum, section 911(d)(3) provides that, regardless of the location of an individual's principal place of business, he will not be treated as having a tax home in a foreign country for any taxable period during which his abode is in the United States.  See Harrington v. Commissioner, 93 T.C. 297, 303, 307 (1989);

sec. 1.911-2(b), Income Tax Regs.  Neither section 911 nor the regulations underlying that provision define the term "abode".[6]

The Court has explained in prior cases involving the foreign earned income exclusion that the term "abode" has a domestic connotation that stands in contrast to the taxpayer's principal place of business.  See Bujol v. Commissioner, T.C. Memo. 1987-230, aff'd without published opinion, 842 F.2d 328 (5th Cir. 1988). In determining the taxpayer's abode under section 911(d), the Court evaluates "the taxpayer's domestic ties (i.e., his familial, economic, and personal ties) to the United States with his ties to the foreign country in which he claims a tax home" during a particular period.  See Harrington v. Commissioner, 93 T.C. at 307-308; see also Eram v. Commissioner, T.C. Memo. 2014-60; Daly v. Commissioner, T.C. Memo. 2013-147.  Throughout the period in question Mr. Lock maintained extensive familial, economic, and personal ties to the United States, while his ties to Iraq were quite limited.

Mr. Lock had strong family and personal ties in the United States throughout the period in question.  Ms. Lock and the couple's son resided in the

---

[6]Sec. 1.911-2(b), Income Tax Regs., provides that a taxpayer's temporary presence in the United States or maintenance of a dwelling (whether or not the dwelling is used by the taxpayer's spouse and dependents) does not necessarily mean that the individual's abode is in the United States.

marital home in Florida, and he took them on vacations when he was not working overseas. Although the Locks' marriage apparently was failing, Mr. Lock stayed in contact with Ms. Lock from Iraq, and he relied on her to send him items that he requested. Likewise, Mr. Lock's mother, grandmother, and siblings resided in Kentucky where he visited them at least once a year. Mr. Lock also maintained a Florida driver's license, and he owned two trucks, a boat and a trailer, and numerous firearms that he kept at his home in Florida.

Mr. Lock had numerous economic ties to the United States. He maintained his status as a reserve deputy sheriff in Florida, owned and helped to manage three rental properties there, and organized and served as the resident agent for three startup businesses. He managed his financial affairs through numerous personal and business bank accounts in Florida.

In contrast, Mr. Lock's primary, if not sole, tie to Iraq was his work for TCI. Although he spent a considerable amount of time in Iraq, and we have no doubt that he developed strong bonds with his coworkers and acquaintances there, Mr. Lock clearly looked forward to leaving Iraq whenever he could to spend time with his family and friends in the United States. Mr. Lock was permitted to enter Iraq only on visas of fairly limited duration, and he did not pursue any business opportunities, open a banking account, or purchase any property there. The

austerity of his living quarters in Iraq is strong evidence that his presence in Iraq was transitory and temporary.

Consistent with the foregoing, we conclude that Mr. Lock's abode was within the United States during the years in issue and therefore we sustain respondent's determination that he was not eligible for the foreign earned income exclusion under section 911.[7]

## II. Unreimbursed Employee Business Expenses

As a general rule, the Commissioner's determination of a taxpayer's liability in a notice of deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and the taxpayer generally bears the burden of proving entitlement to any deduction claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).[8]

---

[7]Under the circumstances, we need not decide whether Mr. Lock satisfied the bona fide residence test or the physical presence test of sec. 911(d)(1).

[8]Petitioners do not contend that the burden of proof should be shifted to respondent pursuant to sec. 7491(a), and there is no justification on this record for doing so.

A taxpayer must substantiate claimed deductions by keeping and producing adequate records that enable the Commissioner to determine the taxpayer's correct tax liability. Sec. 6001; Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976); Meneguzzo v. Commissioner, 43 T.C. 824, 831-832 (1965). A taxpayer claiming a deduction on a Federal income tax return must demonstrate that the deduction is allowable pursuant to a statutory provision and must further substantiate that the expense to which the deduction relates has been paid or incurred. Sec. 6001; Hradesky v. Commissioner, 65 T.C. at 89-90.

Under section 162(a), a deduction is allowed for ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. The determination of whether an expenditure satisfies the requirements for deductibility under section 162 is a question of fact. See Commissioner v. Heininger, 320 U.S. 467, 475 (1943).

The term "trade or business" includes performing services as an employee. Primuth v. Commissioner, 54 T.C. 374, 377-378 (1970). The taxpayer bears the burden of proving that a reported employee business expense is a condition of his employment and that he is not entitled to reimbursement from his employer. See Fountain v. Commissioner, 59 T.C. 696, 708 (1973). An expense for which an

employee could claim reimbursement from his employer, but does not, is not an ordinary and necessary expense. See Podems v. Commissioner, 24 T.C. 21, 22-23 (1955); Noz v. Commissioner, T.C. Memo. 2012-272.

A deduction normally is not available for personal, living, or family expenses. Sec. 262(a). In connection with the foregoing, the Court is not obliged to accept testimony that is self-serving and uncorroborated by objective evidence. See Cluck v. Commissioner, 105 T.C. 324, 338 (1995).

We conclude that Mr. Lock is not entitled to the deductions in question, in whole or in part, on alternative grounds. First, he failed to show that he was not eligible to be reimbursed by TCI for the expenses in question. Second, most of the expenses either were personal or were not adequately substantiated.

Although Mr. Lock testified that TCI did not have a written employee reimbursement policy, the record is replete with letters and instructions from TCI which show that the firm was quite adept at managing transportation, housing, communications, and many other matters for employees that it dispatched on overseas missions. Against this record, we find it highly unlikely that TCI did not have a written employee reimbursement policy, and we decline to accept Mr.

Lock's uncorroborated testimony on this point.[9]  On this ground alone, we sustain respondent's determination disallowing the deductions that Mr. Lock claimed for unreimbursed business expenses.

The question of reimbursement aside, many of the expenses in dispute were clearly personal or were not properly substantiated.  Items that fall into this category include expenses for postage and supplies, work clothing, professional dues, the GRE, and weapons and electronics.

Mr. Lock claimed deductions for supplies and the cost of shipping those supplies to Iraq.  There is no evidence in the record, however, identifying the particular supplies or their cost; and Mr. Lock could recall only that the supplies were food items and gear.  Without more we can only conclude that these expenses were personal.

Mr. Lock claimed deductions for the cost of clothing that he wore while working for TCI.  The cost of clothes that are "required or essential in an employment, and which are not suitable for general or personal wear and [are] not so worn" is a deductible expense.  Yeomans v. Commissioner, 30 T.C. 757, 767-769 (1958); see Wasik v. Commissioner, T.C. Memo. 2007-148; Beckey v.

---

[9]A declaration or an affidavit from TCI corroborating Mr. Lock's testimony would have provided the Court with objective evidence on this point.

Commissioner, T.C. Memo. 1994-514. Mr. Lock was not required to wear a uniform while working for TCI and, depending on the circumstances, he normally wore a blazer, a dress shirt and pants, and a tie, or khaki pants and a polo shirt. Because the clothing that Mr. Lock wore to work could serve as general or personal wear, it follows that Mr. Lock is not entitled to a deduction for clothing or uniforms.

Mr. Lock paid an annual membership fee of $180 to the American Forces Benefit Association (AFBA) during the years in issue. Mr. Lock confirmed that TCI did not require membership in AFBA as a condition of his employment. That fact, combined with his description of AFBA member services, indicates that Mr. Lock's membership fees represent a personal expense.

Mr. Lock purportedly paid $133 to take the GRE in 2010 so that he might be eligible to apply for higher level TCI supervisory positions. The regulations under section 162 disallow any deduction for education expenses incurred to meet the minimum educational requirement for qualification in a taxpayer's trade or business or which qualify a taxpayer for a new trade or business. Sec. 1.162-5(b)(2) and (3), Income Tax Regs. The record does not include a description of the supervisory positions that Mr. Lock intended to pursue or the specific educational requirements for those positions. Without this additional information,

we are unable to determine whether this particular expenditure qualifies as a deductible educational expense in accordance with the provisions of section 1.162-5(b), Income Tax Regs.

Mr. Lock purchased weapons (which he kept in Florida), and electronic equipment and tactical gear which he claims to have used in Iraq to perform work for TCI. He acknowledged at trial that most of these items were also used in his startup businesses in Florida. We are not convinced that TCI would not have provided these items to Mr. Lock if they were truly necessary to the successful completion of TCI missions. Moreover, it appears many of these expenses are properly attributable to Mr. Lock's startup businesses.

In sum, respondent's determination disallowing the deductions Mr. Lock claimed for unreimbursed employee business expenses for the years in issue is sustained.

## III. Relief From Joint and Several Liability

Generally, married taxpayers may elect to file a joint Federal income tax return. Sec. 6013(a). After making the election, each spouse normally is jointly and severally liable for the entire tax due. Sec. 6013(d)(3). If certain requirements are met, however, an individual may be relieved of joint and several liability under section 6015, which provides for three forms of relief. We are concerned here

with section 6015(c), which provides apportioned relief in respect of a deficiency to taxpayers who are divorced or separated.

The Court applies a de novo scope and standard of review in deciding whether a taxpayer is entitled to relief under section 6015. See Wilson v. Commissioner, 705 F.3d 980, 993-994 (9th Cir. 2013), aff'g T.C. Memo. 2010-134; Porter v. Commissioner, 132 T.C. 203, 210 (2009). Except as otherwise provided in section 6015, the taxpayer (requesting spouse) bears the burden of proving entitlement to relief. Rule 142(a); Porter v. Commissioner, 132 T.C. at 210.

Under section 6015(c), if the requesting spouse is no longer married to or is legally separated from the spouse with whom she filed the joint return, the requesting spouse may elect to limit her liability to the portion of a deficiency that is properly allocable to her under section 6015(d). Sec. 6015(c)(1), (3)(A)(i)(I).[10] In general, section 6015(d) provides that any item giving rise to a deficiency on a joint return shall be allocated to the spouses as though they had filed separate

---

[10]An election under sec. 6015(c) for any taxable year may be made at any time after a deficiency is asserted but not later than two years after the date on which the Secretary has begun collection activities with respect to the individual making the election. Sec. 6015(c)(3)(B). There is no dispute that Ms. Lock's election was timely.

returns, and the requesting spouse shall be liable only for her proportionate share of the deficiency that results from such allocation. Sec. 6015(d)(1), (3)(A).[11]

Section 6015(c) is ineffective, however, with respect to any portion of a deficiency if the Commissioner proves by a preponderance of the evidence that the requesting spouse had actual knowledge, when signing the return, of an item giving rise to that portion of the deficiency that is otherwise allocable to the nonrequesting spouse. Sec. 6015(c)(3)(C); see Cheshire v. Commissioner, 115 T.C. 183, 195 (2000), aff'd, 282 F.3d 326 (5th Cir. 2002); Stergios v. Commissioner, T.C. Memo. 2009-15. Inasmuch as respondent maintains that Ms. Lock is entitled to relief under section 6015(c), while Mr. Lock opposes that relief, we inquire "whether actual knowledge has been established by a preponderance of the evidence" presented by all three parties. See, e.g., McDaniel v. Commissioner, T.C. Memo. 2009-137, slip op. at 14.

Section 1.6015-3(c)(2), Income Tax Regs., which speaks to a requesting spouse's actual knowledge, provides in relevant part as follows:

> (2) Actual knowledge--(i) In general.--If, under section 6015(c)(3)(C), the Secretary demonstrates that, at the time the return

---

[11]In addition, the requesting spouse's proportionate share of the deficiency shall be increased by the value of any disqualified asset transferred to her by the nonrequesting spouse. Sec. 6015(c)(4). There is no evidence of any transfer of disqualified assets.

was signed, the requesting spouse had actual knowledge of an erroneous item that is allocable to the nonrequesting spouse, the election to allocate the deficiency attributable to that item is invalid, and the requesting spouse remains liable for the portion of the deficiency attributable to that item. The Service, having both the burden of production and the burden of persuasion, must establish, by a preponderance of the evidence, that the requesting spouse had actual knowledge of the erroneous item in order to invalidate the election.

      (A) Omitted income.--In the case of omitted income, knowledge of the item includes knowledge of the receipt of the income. * * *

      (B) Deduction or credit.--(1) Erroneous deductions in general.-- In the case of an erroneous deduction or credit, knowledge of the item means knowledge of the facts that made the item not allowable as a deduction or credit.

Actual knowledge means an "actual and clear awareness (as opposed to reason to know)" about the item giving rise to the deficiency. See Cheshire v. Commissioner, 115 T.C. at 195.

Consistent with the foregoing, we evaluate whether Ms. Lock had actual knowledge of the facts that led to the disallowance of the deductions that Mr. Lock claimed for employee business expenses. See sec. 1.6015-3(c)(2)(i)(B), Income Tax Regs.; see also, e.g., King v. Commissioner, 116 T.C. 198, 204 (2001).

The proper treatment under section 6015(c) of the disallowance of the exclusions that Mr. Lock claimed in respect of his wages merits further discussion.

The record shows that petitioners accurately reported the wages that they earned on line 7 of their tax returns for 2010 and 2011. Consistent with computations appearing on Forms 2555, however, significant portions of Mr. Lock's wages were subtracted from total income on lines 21 of those returns. Under the circumstances, we consider the disallowed exclusions to be more akin to a disallowed deduction or credit as opposed to an item of omitted income within the meaning of section 1.6015-3(c)(2)(i)(A), Income Tax Regs. Consequently, we will evaluate whether Ms. Lock had actual knowledge of the facts that led to the disallowance of the exclusions from income (rather than her knowledge of Mr. Lock's receipt of the income).

The preponderance of the evidence shows that Ms. Lock did not have actual knowledge of the factual circumstances underlying the disallowance of the deductions that Mr. Lock claimed for unreimbursed employee expenses or the exclusions that he claimed for foreign earned income for 2010 and 2011. Ms. Lock has a high school education, and there is no indication that she is sophisticated in tax matters. Although she signed the tax returns in question for herself and Mr. Lock, the tax return preparer, Mr. Sowell, did not review the returns with her. There is likewise no evidence that Mr. Lock discussed with Ms. Lock the facts underlying the items in dispute or that she intentionally avoided

learning about them. In the light of all the circumstances, we conclude that Ms. Lock qualifies for spousal relief under section 6015(c).

We turn to the proper allocation of the tax deficiencies under section 6015(d). As discussed above, the erroneous items underlying the tax deficiencies for 2010 and 2011 are attributable to Mr. Lock. Although the Internal Revenue Service issued tax refunds for those years, the record shows that those refunds were electronically deposited to Mr. Lock's account and he transferred substantial portions of those refunds to other accounts that he controlled. Inasmuch as the record does not reflect that Ms. Lock received a tax benefit on the couple's joint returns, see sec. 6015(d)(3)(B), there is no reason to allocate any portion of the deficiencies to her.

To reflect the foregoing,

Decisions will be entered

under Rule 155.